**Paul COX, Petitioner–Appellee,**

v.

**David H. MILLER, Superintendent, Eastern Correctional Facility, Respondent–Appellant.**

**Docket No. 01–2515.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 13, 2002.

Decided: July 17, 2002.

Richard E. Weill, First Deputy District Attorney (Jeanine Pirro, New York District Attorney of Westchester County; Diane E. Selker, Assistant District Attorney, of counsel), White Plains, NY, for Respondent–Appellant.

Robert N. Isseks (Alex Smith, of counsel), Middletown, NY, for Petitioner–Appellee.

Before: SACK, B.D. PARKER, and JOHN R. GIBSON,* Circuit Judges.

## INTRODUCTION

SACK, Circuit Judge.

Respondent David Miller, Superintendent of New York State's Eastern Correctional Facility, where petitioner Paul Cox is incarcerated, appeals from a judgment of the United States District Court for the Southern District of New York (Charles L. Brieant, Jr., *Judge*) granting Cox's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On December 6, 1994, a New York State jury found Cox guilty of two counts of manslaughter in the first degree for the 1988 killings of Drs. Lakshman Rao Chervu and Shanta Chervu, a married couple. On December 31, 1988, the Chervus resided in the house where Cox had lived as a child. While alcoholically intoxicated, Cox broke into that house, took a knife from the kitchen, and stabbed the Chervus to death. For more than four years thereafter, the crime remained unsolved.

On November 11, 1990, Cox joined Alcoholics Anonymous ("A.A.") and, according to his testimony, thereafter refrained entirely from consuming alcoholic beverages. But as Cox became sober, he increasingly suffered from vivid, anxiety-ridden dreams in which he experienced flashbacks. These eventually led him to realize that it was he who had killed the Chervus.

The Fourth and Fifth Steps of A.A.'s twelve-step therapy program, respectively, instruct members to undertake "a searching and fearless moral inventory" and to "admit[ ] to God, to [them]selves, and to

another human being the exact nature of [their] wrongs." At about the time Cox reached the Fourth Step, he felt a need to confide his guilt of the Chervu killings to other A.A. members. Between 1991 and 1993, Cox confessed to no fewer than seven A.A. members. For example, Cox told his prospective roommate, Ms. H,[1] an A.A. member, because he thought that she should be aware of his recurrent nightmares about the killings before deciding whether to share an apartment with him. He described the killings to her in some detail.

Despite the disclosure, Ms. H moved in with Cox and another A.A. member. Two months later, in the Spring of 1993, H moved out. Then, on her psychiatrist's advice, she revealed to local police what Cox had told her. The police renewed their investigation into the Chervu murders and solicited statements from at least six other A.A. members to whom Cox had confessed. On May 20, 1993, the police arrested Cox and matched his palm print to one that had been taken at the scene of the killings.

Shortly thereafter, a New York State grand jury indicted Cox for second degree murder. Defense counsel then made a pretrial motion to suppress, as privileged, Cox's statements to A.A. members. Supreme Court, Westchester County (James R. Cowhey, *Justice*) denied the motion. Defense counsel also objected to the admission of Cox's statements at his first trial, which ended in a hung jury, and raised in vain a similar objection at his second trial. The second jury convicted Cox of second-degree murder, *see* N.Y.

---

* The Honorable John R. Gibson, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The trial transcript and the parties identify the A.A. members who testified at trial by one-letter pseudonyms. We follow suit. Cox's former girlfriend Jessica, the A.A. member to whom he first confessed, did not testify at trial and is referred to in the transcript and herein by her first name.

Penal Law § 125.25(1), but found that he acted in a state of extreme emotional disturbance, a mitigating circumstance that reduced his conviction to first degree manslaughter, *see id.* § 125.25(1)(a).

Cox appealed his conviction to the Supreme Court Appellate Division, Second Department, arguing that the trial court erred by refusing to exclude the A.A. members' testimony as privileged cleric-congregant communications pursuant to N.Y. C.P.L.R. § 4505. *See* Pet.'s Br. to App. Div. at 41–52. The Appellate Division did not address this argument except to find it "either unpreserved for appellate review or without merit." *People v. Cox,* 264 A.D.2d 854, 854, 696 N.Y.S.2d 177, 178 (2d Dep't 1999) ("*Cox I*"). The Court of Appeals thereafter denied Cox's petition for leave to appeal. *People v. Cox,* 94 N.Y.2d 902, 707 N.Y.S.2d 386, 728 N.E.2d 985 (2000) (Bellacosa, *Judge*).

On May 3, 2001, Cox petitioned the United States District Court for the Southern District of New York for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Cox claimed, *inter alia,* that "statements to his fellow A.A. members constituted confidential communications, the use of which violated [his] rights under the First and Fourteenth Amendments." Pet.'s Br. in Support of his Petition for a Writ of Habeas Corpus at 83. The district court granted Cox's petition. *Cox v. Miller,* 154 F.Supp.2d 787, 793 (S.D.N.Y.2001) ("*Cox II*"). It reasoned that because Second Circuit case law has treated A.A. as a religion for purposes of the Establishment Clause,[2] New York State could not constitutionally construe its cleric-congregant privilege to exclude from its protection communications made during the course of unconventional forms of "religious expres-

sion," including "the disclosure of wrongs to a fellow member [of A.A.] as ordained by the Twelve Steps." *Cox II,* 154 F.Supp.2d at 792. Because the State subpoenaed A.A. members to testify about those disclosures and introduced at trial forensic evidence that would not have been obtained but for the use of Cox's statements by the police, the district court held that Cox's conviction had been obtained in violation of his constitutional rights under the Establishment Clause. *Id.* at 792–93.

We do not dispute the axiom of constitutional law upon which the district court relied: that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). We conclude, however, that Cox failed to establish that his communications to other A.A. members would have been privileged, even were New York's cleric-congregant privilege required to be construed to protect communications made among members of A.A. The privilege only protects disclosures made "in confidence and for the purpose of obtaining spiritual guidance." *People v. Carmona,* 82 N.Y.2d 603, 609, 606 N.Y.S.2d 879, 882, 627 N.E.2d 959, 962 (1993). With few, if any, exceptions, the record fails to establish that Cox communicated with fellow A.A. members in order to seek spiritual guidance. We therefore hold that even were the Establishment Clause to require that some communications between A.A. members in some circumstances be protected under New York's cleric-congregant privilege, Cox's communications in issue here do not qualify for such protection. We need not consider the district court's assertion that the Establishment Clause re-

---

**2.** "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I.

quires states to extend the cleric-congregant privilege to those who "practice a religion without having a clergyman as such, or where all members exercise the office of clergyman to the extent of receiving confessions or confidences." *Cox II*, 154 F.Supp.2d at 792.

## BACKGROUND

### The Killing of the Chervus

On the evening of December 30, 1988, Paul Cox and two of his friends attended a neighborhood keg party. By 11:00 P.M., the kegs had been emptied. Cox and his friends retired to "Gary's Barleycorn," a local bar where they continued drinking. At about 2:00 A.M. on the morning of December 31, the trio left Gary's Barleycorn in a car owned by Cox's mother. With Cox driving, the car soon veered off the road somewhere in Larchmont, New York, careening into a guardrail. Cox's friends decided to return to Gary's Barleycorn to resume drinking. Cox abandoned the wrecked car and his friends and wandered toward his parents' home, where he resided at the time.

Along the way, Cox passed the house at 36 Lincoln Avenue, Larchmont, where Drs. Lakshman and Shanta Chervu, a married couple, resided. The Chervus, immigrants from India, had purchased their home from Cox's parents in 1974. Cox lived there as a child until about the age of seven; according to one witness at trial, he boasted that he "could walk through it blindfolded." Still severely intoxicated, Cox broke into the home by smashing a window pane, picked up a knife from the kitchen, walked upstairs to the Chervus' bedroom, and sat at the edge of their bed. Shanta Chervu awoke, and Cox stabbed her. Lakshman then awoke, and Cox stabbed him repeatedly. He then slit the Chervus' throats. (Cox later said that he thought at the time that he was killing his parents.) Before departing, Cox cleaned up in an effort to avoid leaving fingerprints. He then went to his parents' home and fell asleep.

The next morning at about eight o'clock, Cox was awakened by his mother's banging on his bedroom door. The police had telephoned her at 3:00 A.M. to tell her that her car had been abandoned, and she wanted to know what had happened. Cox concocted a story about a flat tire to explain the accident.

On January 2, 1989, the police discovered the Chervus' bodies. Officers photographed the crime scene, took palm prints and fingerprints, and had autopsies performed. Notwithstanding their efforts, for about four years they were unable to identify a suspect.

Cox testified that he first learned of the killings on January 2, 1989, while watching the evening news. "I immediately ran upstairs and, you know, said, mom, dad, you know, turn on the TV, it's our old house, and, you know, they turned it on and we watched it and that's when we first heard about the murders." Thereafter, Cox began to suffer from anxiety-ridden dreams and "paranoia," which eventually crystallized into a realization that he had killed the Chervus. According to Mr. R, who became Cox's roommate several years later, Cox told R that Cox awoke the morning after the crime to find his clothes covered with blood. He disposed of them in an incinerator and threw the knife with which he had killed the Chervus into a nearby body of water.[3]

---

**3.** According to a Westchester County Police report based on the interviews with Ms. H,

Cox told H that he had buried the knife.

*Alcoholics Anonymous*

Sometime in the spring of 1990, after another night of binge drinking followed by another alcohol-induced blackout, Cox recognized the severity of his drinking problem. With the encouragement of a girlfriend, he began to attend A.A. meetings.

Founded in 1935 in Akron, Ohio, A.A. now has about 50,000 chapters and one million members in the United States.[4] A.A. informational literature describes A.A. as "a fellowship of men and women who share their experience, strength and hope with each other that they may ... stay sober and help other alcoholics achieve sobriety." The literature states that A.A. "requires no definite religious belief as a condition of membership," but its "program of recovery from alcoholism is undeniably based on acceptance of certain spiritual values." Because A.A. members view alcohol as a "power greater than themselves," they believe that "to achieve and maintain sobriety, [they] need to accept and depend upon another Power recognized as greater than themselves." New A.A. members proceed sequentially through its "Twelve Steps" toward sobriety.[5]

At first, Cox found A.A. to be "a too little [sic] religious based"; the references to God made him "uncomfortable." But A.A. meetings helped him control his drinking. On November 11, 1990, Cox joined A.A. and, according to his trial testimony, he never again consumed an alcoholic drink.

*Cox's Revelations to Other A.A. Members*

Several months after joining A.A., Cox reached the Fourth and Fifth Steps of the

4. Though rooted in temperance movements dating back to the late eighteenth century, A.A. grew out of an organization founded by a Lutheran Minister named Frank Buchman who "experienced a religious conversion during a vacation in the British Isles." Thomas J. Reed, *The Futile Fifth Step: Compulsory Disclosure of Confidential Communications Among Alcoholics Anonymous Members*, 70 St. John's L.Rev. 693, 706 (1996). Buchman's "Oxford Groups" believed in "six assumptions," the antecedents of A.A.'s Twelve Steps, including that "all men are sinners," that "confession is a prerequisite to change," and that "the changed soul has direct access to God." *Id.* at 707–08 & n. 72.

5. The Twelve Steps of A.A. are:
 1. We admitted we were powerless over alcohol—that our lives had become unmanageable.
 2. Came to believe that a Power greater than ourselves could restore us to sanity.
 3. Made a decision to turn our will and our lives over to the care of God as we understood him.
 4. Made a searching and fearless moral inventory of ourselves.
 5. Admitted to God, to ourselves, and to another human being the exact nature of our wrongs.
 6. Were entirely ready to have God remove all these defects of character.
 7. Humbly asked Him to remove all of our shortcomings.
 8. Made a list of all persons we had harmed, and became willing to make amends to them all.
 9. Made direct amends to such people wherever possible, except when to do so would injure them or others.
 10. Continued to take personal inventory and when we were wrong promptly admitted it.
 11. Sought through prayer and meditation to improve our conscious contact with God, as we understood Him, praying only for knowledge of His will for us and the power to carry that out.
 12. Having had a spiritual awakening as a result of these steps, we tried to carry this message to alcoholics, and to practice these principles in all our affairs.

 *DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 402–03 n. 3 (2d Cir.2001); *see generally* Alcoholics Anonymous World Servs., *Twelve Steps and Twelve Traditions* (2000) (explaining the Twelve Steps).

Twelve–Step Program, which invite members to make "a searching and fearless moral inventory" of themselves and then to admit "to God, to [them]selves and to another human being the exact nature of [their] wrongs." After an A.A. meeting one night, he drove to the home of his then-girlfriend Jessica, also an A.A. member. In a fit of tears, he admitted that he thought he had murdered the Chervus. Jessica said that she did not believe him capable of such a crime. She . recommended he talk about his fears with Mr. C, his "sponsor," an A.A. member assigned to help new members with the Twelve Steps.

Mr. C testified at trial:

[O]ne night [Cox] called me up in the middle of the night. . . . He was having trouble writing his fourth step and I said: What's the problem? And I remember specifically, ironically saying, how bad could it be, you didn't kill anyone, did you? And then there was a long pause on the phone. . . .

Cox told C "about this incident that he wasn't sure of" because of a blackout (plainly referring to the Chervus' killings); "he was afraid he might have done this." C asked for Cox's permission to speak to other A.A. members, in particular, Mr. O, a senior member who had been sober for about a decade. Thereafter, according to C's testimony, Cox spoke to C about the incident "dozens of times," "specifically [and] not so specifically."

Mr. C told Mr. O about Cox's situation. O said that he wanted to call his father, an A.A. member and lawyer, to ask for advice. Sometime thereafter, O told Cox that his father had said to tell Cox: "[J]ust don't drink and [do] go to [A.A.] meetings." O thought, however, that it also would be prudent for Cox to hire either "a private detective or a lawyer," referring him to a lawyer named Keith McMillan. Cox met McMillan and recounted his story. McMil-

lan decided not to represent Cox, referring him instead to another lawyer, Andrew Rubin, who later acted as Cox's trial counsel. Cox testified that Rubin advised him "to stay in [A.A.], to get into and stay into [sic] therapy and also not to talk to anyone else about [the Chervu killings]."

Cox followed the first part of Rubin's advice—he stayed in A.A. and began to attend therapy sessions with a therapist recommended by another A.A. member. But he disregarded the third part of Rubin's advice—over the course of the next two years, he continued to share his belief that he had killed the Chervus with other A.A. members, including Mr. A, Mr. S, Mr. R, and Ms. H.

Mr. A, an acquaintance of Jessica, testified that Cox approached him after an A.A. meeting to ask whether he had ever killed anyone. Cox thought he could trust A because, Cox testified, A "was someone who talked openly about his gang involvement out in Oakland [and] who I felt possibly could identify with what I was going through." A told Cox that despite his gang affiliation, he had never killed anyone. Cox then told A in some detail about the Chervu killings. A testified that Cox seemed "agitated" because "he was getting close to the fourth step" and "didn't want to go to jail."

According to Mr. S's testimony, in late 1990 or early 1991, after another A.A. meeting, Cox approached Mr. S. Cox "told [S] that he thought that he [Cox] had done something bad . . . [,] that he had killed two people while they slept. . . ." Again, Cox related the events in some detail, describing how he killed the victims and disposed of the bloody clothes and knife the following day. Cox spoke to S about the killings at least a "[c]ouple of times."

In December 1991, Cox moved into an apartment with Mr. R, and the two became friends. Shortly thereafter, Cox told

R about a "dream" in which "he woke up with bloody clothes." On two subsequent occasions, Cox filled out the story, describing the Chervu killings, according to R's trial testimony, "in great detail."

In January 1993, Ms. H spoke with Cox and Mr. R about sharing an apartment with them. Cox told H "that there was something he needed to tell [her] if [she] was to be his roommate." He described a recurring nightmare in which he had been "piecing back together a night that had taken place a couple of years previously." Specifically, H testified at trial, Cox said "that he had broken into the house on Lincoln Street, ... broken through the pane of glass in the back, opened the door to the house, went into the kitchen, got a knife and went upstairs and stabbed the two, the couple sleeping in the bed." He also told H that he returned to the home the next day with cleaning supplies.

### Events Culminating in Cox's Arrest

Despite Cox's confession to Ms. H, she moved in with Cox and Mr. R in February 1993. She lived with them for about two months before moving back to reside with her parents as the result of the onset of mononucleosis. In May 1993, on the advice of her psychiatrist, H decided to convey to the police what Cox had told her. She met with an officer from the Mamaroneck (New York) Police Department and, according to a police report of that meeting, related that Cox had said that:

> he had killed two people in the house he used to live in when he had a flash back [sic] of abuse. He went in and thought he was killing his parents. He made mention of going back to clean up and that he had buried the knife he used.

H also gave the police the names of seven other A.A. members to whom she believed Cox had confessed his crime. The Mamaroneck police conveyed this information to the Larchmont police, who questioned several of these persons. Each recounted Cox's statements. Based on the police investigation, they arrested Cox on May 20, 1993. They took Cox's palm prints, compared them to prints found at the scene of the Chervu killings, and found that Cox's left palm print matched a print taken from molding at the point of entry into the Chervu home.

### The State Prosecutions

Shortly thereafter, a New York State grand jury indicted Cox for second degree murder. Before trial, defense counsel moved for "a pre-trial hearing concerning the accuracy, voluntariness and surrounding circumstances of any statements made by the defendant to any person, including a determination as to whether such statements were privileged." An attached affidavit of Robert J. Mancuso, a member of the firm representing Cox, stated that:

> law enforcement member[s] were led to Paul Cox after becoming aware of, and then interviewing (in a manner which can only be considered intimidating and threatening), several civilians to whom Paul Cox is alleged to have made statements concerning the two homicides.... These statements were made in reliance upon the historical and necessary blanket of confidentiality which involves the free sharing and communication of issues among A.A. members.

The State opposed the motion on the grounds, *inter alia,* that Cox made the statements in question to private citizens not acting at the behest of law enforcement officials; that "[p]rivilege issues are evidentiary issues, not suppression issues"; and that Cox's statements, "even if made in express or implied confidence, do not fall within the recognized privileges protecting them from disclosure or use at trial." Defense counsel responded that New York state courts recognize the exis-

tence of certain privileges, such as the parent-child and executive privileges, despite the absence of an express statute. He requested a hearing to explore this issue. Supreme Court, Westchester County, denied the motion, stating:

> [T]here is no evidence supporting defendant's claims that his statements were made to witnesses acting at the direction of the authorities. Furthermore, there is no privilege issue here.

At Cox's first trial, the State called one Officer Peters to testify to the identity between Cox's palm print and the print found at the crime scene. Defense counsel objected. He argued that this evidence should be suppressed because, but for the statements made by Cox's A.A. peers, the police would have had no probable cause to arrest or even suspect Cox of the Chervus' killings in the first place. The trial court acknowledged counsel's application for suppression as an issue preserved for appeal, but denied it. Cox's first trial ended in a hung jury and mistrial.

At Cox's second trial, defense counsel restated his objection, emphasizing that Cox's conversations with fellow A.A. members "should have been privileged and therefore [Cox] should never have been arrested; had he not been arrested the prints would not have been obtained from him." The trial judge again overruled the objection. The second jury found Cox guilty of intentional murder, but concluded by a preponderance of the evidence that he had acted while "under the influence of extreme emotional disturbance." N.Y. Penal Law § 125.25. This finding reduced Cox's conviction to two counts of manslaughter in the first degree. *See id.* He was sentenced to two consecutive terms of eight and one-third to twenty-five years imprisonment.

*Proceedings in the Appellate Division*

Cox appealed to the Supreme Court Appellate Division, Second Department, which affirmed his conviction and sentence. *Cox I.* Defense counsel again raised the issue of an A.A. privilege, arguing that statements made in violation of this privilege should have been suppressed under New York's cleric-congregant privilege. *See* Pet.'s Br. to App. Div. at 41–49. The State answered that "A.A. is not a religion" and "members of the A.A. group would not be deemed clerics." State's Br. to App. Div. at 41. The Appellate Division did not address this issue except to find it, like several other issues raised by Cox on direct appeal, "either unpreserved for appellate review or without merit." *Cox I,* 264 A.D.2d at 854, 696 N.Y.S.2d at 178. Cox's application for leave to appeal to the Court of Appeals was denied. *People v. Cox,* 94 N.Y.2d 902, 707 N.Y.S.2d 386, 728 N.E.2d 985 (2000).

*Cox's Habeas Corpus Petition: The District Court's Decision*

On May 3, 2001, Cox petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He raised six grounds for relief, including that "statements to his fellow A.A. members constituted confidential communications, the use of which violated Cox's rights under the First and Fourteenth Amendments," and that his "fingerprints [sic] and palm print were the fruits of an arrest unsupported by probable cause and their admission was in violation of the Fourth Amendment." Pet.'s Br. in Support of his Petition for a Writ of Habeas Corpus at 81, 83. The district court limited its analysis to these two issues. *See Cox II,* 154 F.Supp.2d at 788. After canvassing the facts, the court noted that upon learning the identity of Cox's fellow A.A. members from Ms. H, the assistant district attorney "interrogated [them] in apparent violation of the confi-

dentiality which A.A. holds out to its communicants." *Id.* at 790. Based on this information, the police arrested Cox, took his prints, and matched them to prints found at the crime scene. *Id.*

The district court rejected the idea that the "doctrine of inevitable discovery" applied because "the fingerprints which tie Petitioner to the crime are a direct result of the disclosure to authorities of the communication which Petitioner had with his fellow members of A.A." *Id.* The court then reviewed the origins of New York's cleric-congregant privilege, *id* at 790–91, and quoted the New York Court of Appeals' explanation in *Carmona* that " 'New York's test for the privilege's applicability distills to a single inquiry: whether the communication in question was made in confidence and for the purpose of obtaining spiritual guidance,' " *Cox II,* 154 F.Supp.2d at 791 (quoting *Carmona,* 82 N.Y.2d at 609, 606 N.Y.S.2d at 882, 627 N.E.2d at 962).

Because the Appellate Division did not address Cox's claim of privilege "except by its ordinary boilerplate phrase to the effect that all other issues were 'either unpreserved for appellate review or without merit,' " *Cox II,* 154 F.Supp.2d at 791 (quoting *Cox I,* 264 A.D.2d at 854, 696 N.Y.S.2d at 178), the district court concluded that the Appellate Division "adopted" the State's arguments: namely, that whether to extend the cleric-congregant privilege to A.A. communications remains within the sole province of the New York legislature, and that in any event A.A. is not a religion. *See id.* at 791–92, 696 N.Y.S.2d 177.

The district court remarked that while it might agree with the respondent "were the issue an open one," this Circuit has held that A.A. is a religion for purposes of the Establishment Clause. *Id.* at 792, 696 N.Y.S.2d 177. The court reasoned that "[t]here is no principled basis for a court to hold that A.A. is a religion for Establishment Clause purposes, and yet that disclosure of wrongs to a fellow member as ordained by the Twelve Steps does not qualify for purposes of a privilege granted to other religions similarly situated." *Id.* The district court further remarked: "Clearly it is possible as a matter of Constitutional law to have and to practice a religion without having a clergyman as such, or where all members exercise the office of clergyman to the extent of receiving confessions or confidences." *Id.* It therefore held that New York's cleric-congregant privilege must be construed to extend to A.A. communications, lest it violate the Establishment Clause by discriminating against "a less conventional religious expression." *Id.* Because, in the absence of this alleged constitutional violation, the police would not have matched Cox's prints with those taken from the crime scene, the district court concluded that they "properly should have been suppressed as 'fruit of the poison[ous] tree.' " *Id.* at 793, 696 N.Y.S.2d 177. It granted Cox's petition for a writ of habeas corpus but stayed issuance of the writ *sua sponte* pending appellate review. *Id.*

This appeal followed.

## DISCUSSION

### I. Standard of Review and Procedural Posture

We review *de novo* a district court's decision to grant a writ of habeas corpus. *Morris v. Reynolds,* 264 F.3d 38, 45 (2d Cir.2001). Before the district court granted the writ, however, it had to determine both that the underlying constitutional claim advanced by Cox had been exhausted, *see* 28 U.S.C. § 2254(b)(1)(A) (precluding federal habeas relief unless

the petitioner "has exhausted the remedies available in the courts of the State" of conviction); and that it was not procedurally barred by an independent and adequate state ground, *see Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (noting that the "independent and adequate state ground" doctrine bars federal habeas corpus relief if "a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement"). We agree with the district court that neither exhaustion nor procedural default precluded its consideration of Cox's constitutional claim on the merits.

*A. Exhaustion*

■ *1. Principles of Law.* Title 28 U.S.C. § 2254(b)(1)(A) requires persons "in custody pursuant to the judgment of a State court" to "exhaust[ ] the remedies available in the courts of [that] State" before a federal court may grant them habeas corpus relief. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (collecting cases); *Daye v. Attorney General,* 696 F.2d 186, 190–91 (2d Cir. 1982) (in banc) (same). To exhaust a federal claim, a petitioner must " 'fairly present[ ]' to the state courts the 'substance' of" that claim. *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (quoting *Picard,* 404 U.S. at 275, 92 S.Ct. 509). "This means, in essence, that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Daye,* 696 F.2d at 192.

In *Daye* we said that a petitioner may "fairly present" a constitutional claim, "even without citing chapter and verse of the Constitution," in at least four ways: (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.* at 194; *see also Ramirez v. Attorney General,* 280 F.3d 87, 95 (2d Cir.2001) (same; quoting *Daye* ).

■ *2. Analysis.* The district court concluded that Cox's arguments to the Appellate Division fairly presented the issue he now raises as grounds for habeas relief. *Cox II,* 154 F.Supp.2d at 792. We agree. In his brief to the Appellate Division, Cox cited, *inter alia,* the decision of the New York Court of Appeals in *Griffin v. Coughlin,* 88 N.Y.2d 674, 649 N.Y.S.2d 903, 673 N.E.2d 98 (1996), *cert. denied,* 519 U.S. 1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997). *See* Pet.'s Br. to App. Div. at 43. In *Griffin,* the court found that "doctrinally and as actually practiced in the 12–step methodology, adherence to the A.A. fellowship entails engagement in religious activity and religious proselytization." *Id.* at 683, 649 N.Y.S.2d at 908, 673 N.E.2d at 103. Relying on *Griffin* and other caselaw, Cox argued that "A.A. is a religious organization for constitutional purposes," Pet.'s Br. to App. Div. at 42, and that the cleric-congregant privilege should extend to communications made between members of A.A., *see id.* at 41–49. Cox also argued that his arrest violated the Fourth and Fourteenth Amendments to the United States Constitution because the evidence supporting probable cause derived from inculpatory statements made by fellow A.A. members. *Id.* at 50–52.

To be sure, as the appellant argues, Cox's brief focused primarily on persuading the Appellate Division of the policy rationales for extending New York's cleric-

congregant privilege to A.A. But a petitioner need not expressly cite "chapter and verse of the Constitution," *Daye*, 696 F.2d at 194, to present an issue " 'in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of a federal question,' " *Fortini v. Murphy*, 257 F.3d 39, 44 (1st Cir.2001) (quoting *Scarpa v. DuBois*, 38 F.3d 1, 6 (1st Cir.1994)), *cert. denied*, 513 U.S. 1129, 115 S.Ct. 940, 130 L.Ed.2d 885 (1995). Considered as a whole, Cox's brief sufficed to alert the Appellate Division to the existence of a potential constitutional defect in an interpretation of New York's cleric-congregant privilege that excluded from its scope A.A., which the New York Court of Appeals deems to be a religious organization for at least some Establishment Clause purposes. *Cf. Sanders v. United States*, 373 U.S. 1, 16, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) (observing that because "identical grounds [for relief] may often be supported by different legal arguments," or "couched in different language," doubts about "whether two grounds are different or the same ... should be resolved in favor of the applicant") (internal citations omitted).

### B. Procedural Default

■ *1. Principles of Law.* The "independent and adequate state ground" doctrine precludes federal review of any state court decision that "rests on a state law ground that is independent of the federal question and adequate to support the judgment"; and this rule "applies whether the state law ground is substantive or procedural." *Coleman*, 501 U.S. at 729, 111 S.Ct. 2546; *see also Fox Film Corp. v. Muller*, 296 U.S. 207, 210, 56 S.Ct. 183, 80 L.Ed. 158 (1935). We presume, however, that no procedural bar exists where "the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Coleman*, 501 U.S. at

734–35, 111 S.Ct. 2546 (internal quotation marks omitted); *see also Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.") (internal punctuation omitted); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir.2000) (noting that "[a]bsent a plain statement" in the decision of the state court that its rejection of a claim rests on a state procedural ground, federal courts "conclusively presume" otherwise).

■ *2. Analysis.* The appellant notes that the proceedings in the state trial court provided grounds for the Appellate Division to find Cox's claim procedurally barred. For example, the appellant observes that defense counsel failed to move to suppress the A.A. members' inculpatory statements based on an alleged privilege in his pretrial omnibus motion, as required by N.Y.Crim. Proc. Law §§ 255.10(1)(f) and 255.20(1), thereby waiving this claim. But we see nothing in the decision of the Appellate Division to suggest, let alone state plainly, that it viewed this claim as waived. The court said only that Cox's "remaining contentions," which included whatever constitutional arguments he made, "are either unpreserved for appellate review or without merit." *Cox I*, 264 A.D.2d at 854, 696 N.Y.S.2d at 178. The Appellate Division did not clearly and expressly state that its rejection of Cox's federal claims rested on a state-law procedural bar. *See Coleman*, 501 U.S. at 734–35, 111 S.Ct. 2546. Absent a "plain statement," we presume that it did not. *See Jones*, 229 F.3d at 118.

We therefore conclude that Cox's constitutional claim is neither unexhausted nor

procedurally barred, and proceed to consider the appropriate standard of review to be applied to it under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214.

### C. AEDPA Analysis

■ The standard of review applicable to the Appellate Division's decision on Cox's privilege claim depends on whether that court disposed of the claim on the merits "rather than on a procedural, or other, ground." *Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001). If the Appellate Division adjudicated Cox's claim "on the merits," then we may not grant the writ under AEDPA unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., plurality opinion) (explaining the "contrary to" and "unreasonable application" clauses). If the Appellate Division did not adjudicate Cox's claim on the merits, we review it *de novo. See Washington v. Schriver,* 255 F.3d 45, 55 (2d Cir.2001).

The Appellate Division held that Cox's remaining claims, including his cleric-congregant privilege claim, were "either unpreserved for appellate review or without merit." *Cox I,* 264 A.D.2d at 854, 696 N.Y.S.2d at 178. The district court evidently assumed that the Appellate Division rejected Cox's federal claims on the merits because it applied AEDPA deference to some of them. *See Cox II,* 154 F.Supp.2d at 792–93. While we "conclusively presume" that a claim is not procedurally barred absent a clear statement to the contrary, *Jones,* 229 F.3d at 118, to determine whether a state court "adjudicated" a claim "on the merits," we would ordinarily apply the distinct analysis adopted by our decision in *Sellan, see* 261 F.3d at 314 (adopting the "adjudicated on the merits" analysis set forth in *Mercadel v. Cain,* 179 F.3d 271, 274 (5th Cir.1999)). Here, however, we find it unnecessary to perform that analysis. As in *Washington,* 255 F.3d at 55, our disposition of this appeal would be the same whether we were to review the petitioner's claim *de novo* or with AEDPA deference.

The appellant, assuming AEDPA deference applies, observes that the Supreme Court has never addressed the relationship between "the clergy privilege and the First Amendment" or between "[A.A.] and the First Amendment." Appellant's Br. at 32–33. It therefore argues that we cannot find the Appellate Division's decision either "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States."* 28 U.S.C. § 2254(d)(1) (emphasis added). This argument misconceives the potential constitutional question presented here. The issue is not whether the First Amendment mandates a cleric-congregant privilege. Cox does not make that argument. The issue is whether, assuming that A.A. must be treated as a "religion" in this context and in light of the New York legislature's choice to enact a cleric-congregant privilege, courts may, under the Establishment Clause, interpret the privilege to extend to some religions but not to A.A. Cox claims, in other words, that New York's privilege officially discriminates against the "religion" of A.A. We need not and do not reach that issue to resolve this appeal. But we note that the prohibition of official discrimination against religions is undoubtedly "clearly established." *See, e.g., Larson,* 456 U.S. at 244, 102 S.Ct. 1673 ("The clearest command of the Establishment

Clause is that one religious denomination cannot be officially preferred over another."); *Bd. of Educ. v. Grumet*, 512 U.S. 687, 703, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("[G]overnment should not prefer one religion to another or religion to irreligion.").

## II. The Cleric–Congregant Privilege

### A. Generally

The cleric-congregant privilege originated in the *sui generis* Catholic sacrament of Penance. *See Lightman v. Flaum*, 97 N.Y.2d 128, 134, 736 N.Y.S.2d 300, 303–04, 761 N.E.2d 1027, 1030–31 (2001); *Nestle v. Commonwealth*, 22 Va.App. 336, 344, 470 S.E.2d 133, 137 (1996) (noting that the privilege had "been established by the Roman Catholic Church as early as the Fifth Century"). Its origins thus predate the development of the modern Anglo–American law of evidence. But the privilege fell into desuetude after the Reformation, *see* 8 J.H. Wigmore, *Wigmore on Evidence* § 2394, at 869 (J.T. McNaughton rev. 1961), and authorities generally agree that it "cannot be said to have been recognized as a rule of the common law, either in England or in the United States," *id.* at 870; *see also Lightman*, 97 N.Y.2d at 134, 736 N.Y.S.2d at 303, 761 N.E.2d at 1030

(2001) (observing that "[t]he clergy-penitent privilege was unknown at common law"); *Keenan v. Gigante*, 47 N.Y.2d 160, 166, 417 N.Y.S.2d 226, 229, 390 N.E.2d 1151, 1154 (1979) ("It has been recognized, without serious disagreement, that there existed no common-law priest-penitent privilege."); *accord Nestle*, 22 Va.App. at 344–45, 470 S.E.2d at 137 (noting that the weight of scholarly authority denies that the cleric-congregant privilege existed at common law at the time of the Founding).

Today, however, every state has enacted the cleric-congregant privilege in some form. Ronald J. Colombo, *Forgive Us Our Sins: The Inadequacies of the Clergy–Penitent Privilege*, 73 N.Y.U. L.Rev. 225, 231 & n. 39 (1998) (collecting statutes).[6] The statutes differ in three principal respects: their definition of "clergy," their scope, and the question of to whom the privilege "belongs," i.e., who may claim or waive, the privilege—the cleric, the congregant, or both. *See id.* at 231–32.

The emergence of a cleric-congregant privilege in New York antedates its adoption of the privilege by statute in 1828. In *People v. Phillips* (N.Y.Ct.Gen.Sess.1813), *excerpted in Privileged Communications to Clergymen*, 1 Cath. Law. 199 (1955) ("*Privileged Communications*"),[7] a grand

---

**6.** Rule 501 of the Federal Rules of Evidence provides that in the absence of a federal statute, evidentiary privileges under federal law "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Only the Third Circuit has expressly adopted a cleric-congregant privilege under Fed.R.Evid. 501. *In re Grand Jury Investigation*, 918 F.2d 374, 377 (3d Cir. 1990). Other federal courts have suggested in *dicta* that one exists. *See, e.g., Mullen v. United States*, 263 F.2d 275, 277 (D.C.Cir. 1959). (Fahy, J., concurring); *McMann v. SEC*, 87 F.2d 377, 378 (2d Cir.) (Hand, J.), *cert. denied*, 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937); *see also Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 63

L.Ed.2d 186 (1980) (enumerating the priest-penitent privilege among those conventionally recognized); *Totten v. United States*, 92 U.S. 105, 107, 23 L.Ed. 605 (1875) (stating that "suits cannot be maintained which would require the disclosure of [*inter alia*] the confidences of the confessional"); *In re Grand Jury Investigation*, 918 F.2d at 381–83 (collecting and describing other federal cases *implicitly* recognizing or assuming the existence of the cleric-congregant privilege under federal common law).

**7.** According to *Privileged Communications, Phillips* was "[n]ot officially reported, but set forth by the attorney who participated in the case. . . . The original records of the case are

jury indicted Daniel Phillips for receiving stolen goods. Phillips, a Roman Catholic, confessed his crime to one Reverend Anthony Kohlmann, whom the State subpoenaed. *Id.* at 199–200. Kohlmann declined to testify, citing "the law of God and his church [that] whatever is declared in confession, can never be discovered," but must "remain an eternal secret between God and the penitent soul—of which the confessor cannot, even to save his own life, make any use at all to the penitent's discredit, disadvantage, or any other grievance whatsoever." *Id.* at 200 (internal quotation marks and citation to the papal decrees omitted). Notwithstanding the "general rule, that every man when legally called upon to testify as a witness, must relate all he knows," *id.* at 201, the court concluded that "the mild and just principles of the common law" could not be construed to place Kohlmann

> in such a horrible dilemma, between perjury and false swearing: If he tells the truth he violates his ecclesiastical oath— If he prevaricates, he violates his judicial oath—Whether he lies or whether he testifies he is wicked, and it is impossible for him to act without acting against the laws of rectitude and the light of conscience.

*Id.* at 203. But the New York Court of General Sessions did not rest its decision on the common law. The court reasoned that because of the constitutional magnitude of the issue, it "must not be solely decided by the maxims of the common law, but by the principles of our government." *Id.* at 206. The court therefore went on to observe that:

> [r]eligion is an affair between God and man, and not between man and man. . . .

Established religions, deriving their authority from man, oppressing other denominations, prescribing creeds of orthodoxy and punishing non-conformity, are repugnant to the first principles of civil and political liberty. . . .

*Id.* Citing the Free Exercise Clause of the New York State Constitution, the court concluded that permitting Kohlmann to invoke the cleric-congregant privilege was "essential to the free exercise of [his] religion." *Id.* at 207.

Four years later, however, in *People v. Smith*, 2 City Hall Recorder (Rogers) 77 (N.Y.1817), *excerpted in Privileged Communications, supra,* at 209, the New York Court of Oyer and Terminer and Gaol Delivery declined to extend the privilege to a suspected murderer who had confessed his crime to a Protestant minister. Unlike Roman Catholicism, the court reasoned, the defendant's religion did not *require* confession as a sacrament. *Id.* at 211.

The New York legislature thereafter determined that as a matter of policy, if not constitutional concern, the privilege recognized in *Phillips* should not be limited to Catholicism. In 1828, it adopted a statute that codified and substantially broadened the *Phillips* privilege:

> No minister of the gospel, or priest of any denomination whatsoever, shall be allowed to disclose any confessions made to him in his professional character, in the course of discipline enjoined by the rules or practice of such denomination.

*Id.* at 213 (quoting N.Y.Rev.Stat. 1828, Pt. 3, ch. 7, tit. 3, § 72). Although enacted nearly two centuries ago, salient features of this statute survive in New York's cur-

---

on display in the library of the Court of General Sessions of the County of New York." *Privileged Communications, supra,* at 199. *See also City of Boerne v. Flores,* 521 U.S. 507,

542–43 & n. 4, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (Scalia, J., concurring in part) (discussing *Phillips* ).

rent codification of the cleric-congregant privilege.

## B. *New York's Cleric–Congregant Privilege*

The statute codifying New York's present version of the cleric-congregant privilege provides:

Unless the person confessing or confiding waives the privilege, a clergyman, or other minister of any religion or duly accredited Christian Science practitioner, shall not be allowed [to] disclose a confession or confidence made to him in his professional character as spiritual advisor.

N.Y. C.P.L.R. § 4505 (footnote omitted). Three seminal decisions of the New York Court of Appeals elucidate the meaning and scope of § 4505.

In *Keenan v. Gigante*, 47 N.Y.2d 160, 417 N.Y.S.2d 226, 390 N.E.2d 1151 (1979), a State grand jury subpoenaed an ordained Roman Catholic priest and former New York City Councilman to testify about alleged abuses within the New York City Department of Corrections. *Id.* at 163–64, 417 N.Y.S.2d at 227–29, 390 N.E.2d at 1152–53. The priest refused to testify, claiming both that his conversations were privileged under § 4505 and that to compel him to testify would "jeopardize the free exercise of his ministry." *Id.* at 165, 417 N.Y.S.2d at 229, 390 N.E.2d at 1153. Rejecting both arguments, the Court of Appeals first observed that the New York legislature had enacted an earlier version of § 4505 in "respon[se] to the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance so that harmony with one's self and others can be realized." *Id.* at 166, 417 N.Y.S.2d at 229, 390 N.E.2d at 1154. For this reason, the privilege does not attach to statements merely because they are made to a clergyman; rather, "it is only

confidential communications made to a clergyman in his spiritual capacity which the law endeavors to protect." *Id.* The court observed that the communications sought to be privileged had not been made in the context of the cleric-congregant relationship, and therefore, "the revelation of such conversations, spoken outside the sphere of confidentiality, cannot be said to fall within the sanctuary of the priest-penitent privilege." *Id.* at 167, 417 N.Y.S.2d at 230, 390 N.E.2d at 1154.

In *People v. Carmona*, 82 N.Y.2d 603, 606 N.Y.S.2d 879, 627 N.E.2d 959 (1993), the New York Court of Appeals explained § 4505 at greater length in the context of criminal proceedings. Carmona had murdered a woman by strangulation and then fled. He surrendered to the police after consulting two clergymen, both of whom had advised him to do so. *See id.* at 605–07, 606 N.Y.S.2d at 880–81, 627 N.E.2d at 960–61. The court considered whether Carmona, by confessing his crime to the police, effectively waived his right to invoke the privilege to exclude the testimony of the clergymen to whom he had confessed previously, a question the court answered in the negative. *See id.* at 608, 606 N.Y.S.2d at 880–81, 627 N.E.2d at 960–61. In the course of its analysis, the Court of Appeals explained:

Although often referred to as a "priest-penitent" privilege, the statutory privilege is not limited to communications with a particular class of clerics or congregants....

[T]he New York statute is intentionally aimed at all religious ministers who perform "significant spiritual counselling which may involve disclosure of sensitive matters".... Accordingly, what is more appropriately dubbed the "cleric-congregant" privilege is applicable to ministers of all religions, most of which have no

ritual analogous to that of the Catholic confession.... New York's test for the privilege's applicability distills to a single inquiry: whether the communication in question was made in confidence and for the purpose of obtaining spiritual guidance....

*Id.* at 608–09, 606 N.Y.S.2d at 882, 627 N.E.2d at 961–62 (citations omitted). *Carmona* thus made it clear that far from discriminating among religions, the New York legislature intended § 4505 to protect confidential communications between clerics and congregants of all religions,[8] provided that the communication in question qualifies as the kind that the legislature intended, as a matter of policy, to protect: those "made in confidence and for the purpose of obtaining spiritual guidance." *Id.* at 609, 606 N.Y.S.2d at 882, 627 N.E.2d at 962; *see also Keenan,* 47 N.Y.2d at 166, 417 N.Y.S.2d at 229, 390 N.E.2d at 1154 (explaining § 4505's policy rationale).

Most recently, in *Lightman v. Flaum,* 97 N.Y.2d 128, 736 N.Y.S.2d 300, 761 N.E.2d 1027 (2001), the New York Court of Appeals drew a critical distinction between the cleric-congregant privilege and other evidentiary privileges set forth in Article 45 of the New York Civil Practice Law and Rules. The court noted that "[s]tatutes and regulations specifically prohibit the disclosure of confidences and [at times prescribe] sanctions for professional misconduct" with regard to, *inter alios,* attorneys and physicians. *Id.* at 136, 736 N.Y.S.2d at 305, 761 N.E.2d at 1032. By contrast, "clerics are free to engage in religious activities without the State's permission, they are not subject to State-dictated educational prerequisites and, significantly, no comprehensive statutory scheme regulates the clergy-congregant spiritual counseling relationship." *Id.*

Citing the Establishment and Free Exercise Clauses of the United States Constitution, the Court of Appeals emphasized that to hold court on the truth or falsity of religious beliefs, to engage in fact-finding to determine the "right" interpretation of a religion, would threaten "simultaneously [to] establish one religious belief as correct ... while interfering with the free exercise of the opposing faction's beliefs." *Id.* at 137, 736 N.Y.S.2d at 306, 761 N.E.2d at 1033 (citations and internal quotation marks omitted). Because establishing civil liability based on purported breaches of a § 4505 fiduciary duty would require a trier of fact to determine the "true" religious rules governing the revelation of communications between clergy and congregants,

---

**8.** For example, § 4505 refers to "a clergyman, or other minister of any religion *or duly accredited Christian Science practitioner.*" (Emphasis added.) Practitioners of Christian Science do not believe in an ordained clergy because "every member has equal standing with God." The Church of Christ, Scientist, *Questions and Answers: Why don't you have ministers?, at* http://www.tfccs.com/GV/QANDA/TMCQ2 (last visited June 27, 2002). But § 4505 requires Christian Science practitioners to be "duly accredited" in order for communications with them to fall under the aegis of the privilege; simply joining the church does not suffice to transform a lay person into a "cleric" to whom § 4505 applies, and accreditation requires a prescribed course of study. *See* The Church of Christ, Scientist,

*Questions and Answers: What is a Christian Science Practitioner?, at* http://www.tfccs.com/GV/QANDA/CSHQ5 (last visited June 27, 2002). By amending § 4505 to include an express reference to "duly accredited Christian Science practitioner[s]," N.Y. C.P.L.R. § 4505, the New York legislature signaled its intent to extend the privilege to religions that define clergy broadly. At the same time, § 4505's emphasis on the professional character of clergy and accreditation suggests that New York courts might not permit the nominal or perfunctory designation of lay persons as "clerics" for purposes of shielding from disclosure information otherwise outside of the scope of § 4505.

the court rejected the congregant's claim for damages based on an alleged breach of the "fiduciary duty" she asserted her rabbis owed her by virtue of § 4505. *Id.* at 137, 736 N.Y.S.2d at 305–306, 761 N.E.2d at 1032–33.

*C. Applying § 4505*

Guided by the foregoing decisions, it is clear that to determine whether § 4505 applies, four issues are implicated: the definition of "a clergyman, or other minister of any religion," the scope of § 4505's protection, the "ownership" of the privilege, and the effect of the privilege when asserted. On the facts of this case, however, we need inquire as to only one: the scope of the privilege.[9]

 To fall within § 4505's protection, a communication must be made "in confidence and for the purpose of obtaining spiritual guidance." *Carmona*, 82 N.Y.2d at 609, 606 N.Y.S.2d at 882, 627 N.E.2d at 962; *see also Keenan*, 47 N.Y.2d at 166, 417 N.Y.S.2d at 229, 390 N.E.2d at 1154; *People v. Drelich*, 123 A.D.2d 441, 442–43, 506 N.Y.S.2d 746, 748 (2d Dep't 1986); *People v. Reyes*, 144 Misc.2d 805, 807, 545 N.Y.S.2d 653, 654 (Sup.Ct. Queens County 1989). Section 4505 does not operate to "enshroud conversations with wholly secular purposes solely because one of the parties to the conversation happens to be a religious minister." *Carmona*, 82 N.Y.2d at 609, 606 N.Y.S.2d at 882, 627 N.E.2d at 962; *see also In re Fuhrer*, 100 Misc.2d 315, 320, 419 N.Y.S.2d 426, 430–31 (Sup.Ct.

Richmond County 1979) (discussing the scope of the privilege).

Thus, in *Keenan*, the Court of Appeals refused to apply the privilege where "the questions which appellant [an ordained Catholic priest] was directed to answer [in a grand jury hearing] did not jeopardize the atmosphere of confidence and trust which allegedly enveloped the relationship between appellant and [the congregant]." 47 N.Y.2d at 167, 417 N.Y.S.2d at 229–30, 390 N.E.2d at 1154. "Compelling disclosure as to these matters would not do violence to the social policies underlying the priest-penitent privilege...." *Id.* at 167, 417 N.Y.S.2d at 230, 390 N.E.2d at 1154. Similarly, in *Fuhrer*, Supreme Court, Richmond County, held the privilege inapposite where "[n]one of the questions propounded to the Witness appear to involve 'spiritual' matters ... [or] communications made for. the purpose of seeking religious counsel, advice, solace, absolution or ministration." 100 Misc.2d at 321, 419 N.Y.S.2d at 431 (internal punctuation omitted). And in *United States v. Wells*, 446 F.2d 2 (2d Cir.1971), we held that a defendant's letter to a priest requesting that the priest contact a federal agent fell outside the scope of the privilege, noting that "[t]he letter contains no hint that its contents were to be kept secret, or that its purpose was to obtain religious or other counsel, advice, solace, absolution or ministration," *id.* at 4.

This principle, New York case law makes clear, applies to all religions without

9. For purposes of the analysis that follows, we note that under New York law the privilege "belongs" to the congregant whose burden it is to establish that the privilege applies, *see, e.g., De'udy v. De'udy*, 130 Misc.2d 168, 173, 495 N.Y.S.2d 616, 619 (Sup.Ct. Nassau County 1985) (stating that "the privilege is that of the penitent, not the clergy"), and thus the congregant bears "[t]he burden ... to establish that a communication sought to be shield-

ed was made for the purpose of seeking religious counsel," *People v. Drelich*, 123 A.D.2d 441, 443, 506 N.Y.S.2d 746, 748 (2d Dep't 1986); *see also People v. Schultz*, 161 A.D.2d 970, 971, 557 N.Y.S.2d 543, 545 (3d Dep't 1990) (noting that the "burden of establishing the statutory confidentiality of a communication is upon the individual invoking the privilege").

distinction. *See People v. Drelich*, 123 A.D.2d 441, 443, 506 N.Y.S.2d 746, 748 (2d Dep't 1986) (finding communications made to a rabbi "for the secular purpose of seeking assistance in the retention of counsel" outside § 4505's scope); *People v. Schultz*, 161 A.D.2d 970, 971, 557 N.Y.S.2d 543, 545 (3d Dep't 1990) (allowing no privilege where defendant sought a priest for the purpose of contacting an attorney, not to seek "religious counsel, advice, solace, absolution or ministration"); *People v. Johnson*, 115 A.D.2d 973, 497 N.Y.S.2d 539, 539–40 (4th Dep't 1985) (finding communications made by a Muslim to fellow members of his mosque not privileged because it was not the defendant who initiated the conversations for the purpose of seeking spiritual guidance but rather "members of the mosque who testified that they were motivated by fear that defendant might be dangerous").[10]

### III. Analysis of Cox's Privilege Claim

#### A. *Principles of Interpretation*

■ 1. *Construction of Evidentiary Privileges.* Because claims of privilege derogate from the public's " 'right to every [person's] evidence,' " *Trammel*, 445 U.S. at 50, 100 S.Ct. 906 (quoting *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)), "they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth,' " *id.* (quoting *Elkins v. United States*, 364 U.S. 206, 234, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)

(Frankfurter, J., dissenting)); *see also Nixon*, 418 U.S. at 709–10, 94 S.Ct. 3090 (noting the exceptional nature of evidentiary privileges); *accord Keenan*, 47 N.Y.2d at 168, 417 N.Y.S.2d at 230, 390 N.E.2d at 1155 (emphasizing the "enduring command that every man owes a duty to society to give evidence when called upon to do so") (internal punctuation and citations omitted).

2. *A.A.'s Status for Purposes of Establishment Clause Analysis.* We have twice treated A.A. as a "religion" for purposes of Establishment Clause analysis. *DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 407 (2d Cir.2001); *Warner v. Orange County Dep't of Prob.*, 115 F.3d 1068, 1075 (2d Cir.1997), *reaff'd after remand*, 173 F.3d 120 (2d Cir.), *cert. denied*, 528 U.S. 1003, 120 S.Ct. 495, 145 L.Ed.2d 382 (1999). In *Warner*, we held that the Department of Probation of Orange County, New York, violated the Establishment Clause by in effect compelling the plaintiff to attend A.A. meetings as a condition of probation, because " 'at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise.' " 115 F.3d at 1074 (quoting *Lee v. Weisman*, 505 U.S. 577, 587, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)). We observed that

> [t]he A.A. program to which [the plaintiff] was exposed had a substantial religious component. Participants were told to pray to God for help in overcoming their affliction. Meetings opened and closed with group prayer.... We have no doubt that the meetings [the plaintiff] attended were intensely religious events.

---

**10.** Consistent with New York law's emphasis on the *purpose* of the communication, New York courts also have held that "[a] confession by a penitent to a clergyman for spiritual advice, aid or comfort is privileged even though the penitent is not a member of the church to [sic] which she seeks spiritual advice." *Kohloff v. Bronx Sav. Bank*, 37 Misc.2d 27, 27–28, 233 N.Y.S.2d 849, 850 (Civ.Ct.1962); *see also Fuhrer*, 100 Misc.2d at 320, 419 N.Y.S.2d at 430 (same; citing *Kohloff*).

*Id.* at 1075. In *DeStefano*, where we inquired into the propriety of State funding of an alcoholism treatment center, we said that the district court had correctly treated A.A. as "a 'religion' for Establishment Clause purposes." 247 F.3d at 407. We perceived "no basis" for distinguishing the A.A. program at issue in *DeStefano* from that in *Warner* because both "use[d] the same Twelve Step system," distributed literature encouraging members to take "religious 'steps,'" and "conduct[ed] meetings in which these beliefs [we]re inculcated." *DeStefano*, 247 F.3d at 407.[11]

The district court in this case now before us evidently thought itself constrained by these decisions to conclude that § 4505 must be extended to protect from disclosure communications made among members of A.A. *See Cox II*, 154 F.Supp.2d at 792. It saw "no principled basis for a court to hold that AA is a religion for Establishment Clause purposes, and yet that the disclosure of wrongs to a fellow member as ordained by the Twelve Steps

does not qualify for purposes of a privilege granted to other religions similarly situated." *Id.*

Asking that we reject the district court's conclusion, the appellant cautions us against "establishing" A.A. as a "religion" and "concomitantly labeling its members as members of a religious sect," lest we offend "atheists and agnostics [and members of other organized religions] who have reconciled their personal beliefs with their participation in AA." Appellant's Br. at 49. We do no such thing.[12]

Organizations and community activities of many kinds, including, as here, therapeutic recovery-programs for alcohol or drug addiction, may involve "substantial religious component[s]," *Warner*, 115 F.3d at 1075, such that the government may not coerce individuals to participate in them or fund the inculcation of their beliefs without violating the Establishment Clause. But plainly, as the appellant urges, such organizations or community activities do not, for that reason, become or consider themselves to be "religions" in the ordinary sense of the word.[13] Step Three of the

---

**11.** We are not alone in concluding that A.A.'s activities must be treated as religious for purposes of such Establishment Clause analysis. Not only did the New York Court of Appeals reach the same conclusion, *Griffin*, 88 N.Y.2d at 683, 649 N.Y.S.2d at 908, 673 N.E.2d at 103, to the best of our knowledge, no court presented with an Establishment Clause challenge implicating A.A. or a comparable therapy program incorporating religious concepts has reached a contrary one. *See DeStefano*, 247 F.3d at 407 (collecting cases); *Rauser v. Horn*, No. 98–1538, 1999 WL 33257806, at *7, 1999 U.S. Dist. LEXIS 22583, at *19–*20 (W.D.Pa. Nov.2, 1999) (finding coerced participation in A.A. or the materially indistinguishable Narcotics Anonymous program as a condition of parole to violate the Establishment Clause), *rev'd on other grounds*, 241 F.3d 330 (3d Cir.2001); *cf. In re Garcia*, 106 Wash.App. 625, 630, 24 P.3d 1091, 1094 (2001) (agreeing that "mandating attendance at [A.A.] classes" violates the Establishment Clause but finding no violation where "alter-

native classes without religious-based content [we]re provided").

**12.** Neither *Warner* nor *DeStefano* nor *Griffin* held that A.A. *is* "a religion"; rather, because of its "substantial religious component," *Warner*, 115 F.3d at 1075, we have treated A.A. as a religion for purposes of certain Establishment Clause analyses. *See DeStefano*, 247 F.3d at 423 (declining to distinguish the religious activities of A.A. from the activities of "other religions *for Establishment Clause purposes*") (emphasis added); *accord Griffin*, 88 N.Y.2d at 683, 649 N.Y.S.2d at 908, 673 N.E.2d at 103 (observing that A.A.'s "expressions and practices constitute, as a matter of law, religious exercise *for Establishment Clause purposes*") (emphasis added); *cf. DeStefano*, 247 F.3d at 422 ("It is difficult to imagine A.A. as the official or unofficial state religion of New York.").

**13.** A.A. literature submitted by Cox describes A.A. not as "a religious society," but as a "program of recovery from alcoholism," al-

A.A. Twelve–Step Program invites A.A. members "to turn [their] will and [their] lives over to the care of God as [they] underst[and] him." We doubt, however, that many members of A.A. would therefore identify themselves as members of "the A.A. religion." A Catholic, Protestant, Jewish, Muslim, or Zoroastrian alcoholic need not relinquish his or her religious beliefs and "convert" to A.A. in order to follow its precepts.

We have nonetheless held that when engaging in Establishment Clause analysis in certain settings we must treat A.A. the same as we would a group or organization that is a "religion" in the popular sense because some of A.A.'s activities and modes of expression are religious in nature. As the Seventh Circuit observed, the inclusion of qualifiers in the tenets of A.A. (e.g., "God *as we understood Him*")—which indicates that A.A. does not mandate one religious dogma—fails to remove it from the realm of religious activity in which the government may not, consistent with the Establishment Clause, compel citizens to participate and which the government may not fund:

> True, [the] God [referred to in the twelve steps of the materially indistinguishable Narcotics Anonymous program] might be known as Allah to some, or YHWH to others, or the Holy Trinity to still others, but the twelve steps consistently refer to "God, as we understood *Him*." Even if we expanded the steps to include polytheistic ideals, or animistic philosophies, they are still fundamentally based on a religious concept of a Higher Power.

*Kerr v. Farrey*, 95 F.3d 472, 480 (7th Cir.1996) (emphasis in original).

We have treated A.A. the same as we would a traditional religion where the State compelled participation in A.A. despite its "intensely religious" nature, *Warner*, 115 F.3d at 1075; and where the State allegedly funded *"governmental* indoctrination" in A.A., *DeStefano*, 247 F.3d at 415 (emphasis in original). In *DeStefano* we explained, citing in part *Agostini v. Felton*, 521 U.S. 203, 234, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), that

> when presented with Establishment Clause challenges, we are required to ask " 'whether the government acted with the purpose of advancing or inhibiting religion' and 'whether the aid has the effect of advancing or inhibiting religion.' " ... We employ "three primary criteria" to answer the latter question: [1] whether the action or program "results in governmental indoctrination; [2] defines its recipients by reference to religion; or [3] creates an excessive entanglement."

*DeStefano*, 247 F.3d at 406 (internal citations and punctuation omitted). Both *Warner* and *DeStefano* were decided under the first of the "three primary criteria"—governmental indoctrination. Both involved governmental coercion to engage in or pay for religious activity. It is in the course of that inquiry in *DeStefano* that we referred to A.A. as "a 'religion' for Establishment Clause purposes."

But Cox's challenge to New York's cleric-congregant privilege here appears to be based on the second of the "three primary [*Agostini*] criteria": whether New York determines the applicability of its cleric-congregant privilege by reference to the religion of the person asserting it. We are not certain whether we would treat A.A. the same as we treat traditional religions

---

beit one "based on acceptance of certain spiritual values." According to the literature, A.A. disclaims the suggestion that it is "a

religion" in the same sense as, for example, Catholicism, Judaism, Buddhism, or Islam.

in this context. We need not address this question, however, because, as we will discuss, Cox failed to establish that he spoke with fellow A.A. members "in confidence and for the purpose of obtaining spiritual guidance." *Carmona*, 82 N.Y.2d at 609, 606 N.Y.S.2d at 882, 627 N.E.2d at 962. His communications at issue· here would therefore not be privileged even if A.A.'s activities were required to be treated the same as those of Catholicism, Judaism, Islam, and Christian Science.

### B. Analysis of Cox's Privilege Claims

■ Cox confessed his killing of the Chervus—at times explicitly, at other times less so—to no fewer than seven fellow A.A. members: (1) Jessica, his former girlfriend, (2) Mr. C, Cox's A.A. sponsor, (3) Mr. O, a senior member of Cox's A.A. chapter, (4) Mr. A, a former gang member who attended some A.A. meetings at which Cox was present, (5) Mr. S, another fellow A.A. member, (6) Mr. R, Cox's roommate and personal friend, and (7) Ms. H, another A.A. member who shared an apartment with Cox and R for about two months. Cox, the congregant seeking to invoke the privilege, bore the burden to establish that his communications to these persons fell within the scope of § 4505. ·See *Drelich*, 123 A.D.2d at 443, 506 N.Y.S.2d at 748; *accord Schultz*, 161 A.D.2d at 971, 557 N.Y.S.2d at 545. He failed to carry it. Assuming that all the relevant conversations were made in confidence, the record makes clear that Cox did not confess his culpability for the Chervu killings "for the purpose of obtaining spiritual guidance." *Carmona*, 82 N.Y.2d at 609, 606 N.Y.S.2d at 882, 627 N.E.2d at 962.

The first fellow A.A. member to whom Cox confessed was Jessica, then his girlfriend. In a fit of tears, Cox told her that he believed he had killed the Chervus. Nothing in Cox's testimony suggests that this emotional outpouring to a lover reflected a search for spiritual guidance.

Jessica told Cox to speak to his A.A. sponsor, Mr. C., about his fears. Cox argues that he sought C's "guidance" about a spiritual matter, namely, how to handle the fourth step of A.A.'s religiously imbued program of recovery from alcoholism. But the record does not, we think, bear out this argument. C, by his own account, did not think himself capable of dealing with Cox's confession. He responded by asking for and receiving Cox's permission to speak to other A.A. members. Mr. C and Mr. O, with whom C later shared Cox's story, advised Cox to get "a private detective or a lawyer." While the relevant inquiry is what Cox sought rather than what advice C and O, the putative clerics, in fact gave him, the nature of their ongoing communications with Cox suggests that he sought practical and legal, not spiritual, advice. *See Wells*, 446 F.2d at 4 (rejecting a federal common-law privilege claim where the defendant requested that a priest help him to contact an FBI agent); *Drelich*, 123 A.D.2d at 443, 506 N.Y.S.2d at 748 (rejecting a privilege claim under N.Y. C.P.L.R. § 4505 where the defendant sought the advice of clergy "for the secular purpose of seeking assistance in the retention of counsel"); *Schultz*, 161 A.D.2d at 971–72, 557 N.Y.S.2d at 545 (same).[14]

---

**14.** Cox's confession to Mr. C came closest to having spiritual overtones. But even if Cox's confession to C could be characterized as a quest for spiritual guidance, and even if C on this basis had refused to disclose the content of Cox's communications to the police, it would not have prevented the police from identifying Cox as a suspect. There is no doubt that based on the information provided by at least six other A.A. members to whom Cox confessed, the police nonetheless would have identified Cox, questioned him, and

Cox subsequently confessed to Mr. A because, Cox testified, A "was someone who talked openly about his gang involvement in Oakland ... someone who I felt possibly could identify with what I was going through." Cox appears to have viewed A as a friend with whom he might share a common experience. A testified that Cox spoke to him because he "was getting close to the fourth step" and "didn't want to go to jail." No plausible reading of this testimony supports the view that Cox sought A's spiritual guidance. Similarly, there is no basis in the record for a conclusion that Cox's multiple conversations with Mr. S., in which Cox described the Chervu killings in some detail, had anything whatever to do with Cox's desire for spiritual or religious guidance.

Finally, Cox revealed his culpability for the Chervu killings to Mr. R, his roommate, and to Ms. H, who proceeded to share their apartment for two months. The record indicates that Cox told R about the killings not to seek spiritual guidance, but because the two of them had become friends. And far from seeking spiritual guidance from H, the A.A. member who first informed law enforcement officers of Cox's story, Cox testified that he told H about the killings because he thought she

should be aware of them before deciding to share an apartment with him.

In sum, Cox spoke with other A.A. members primarily to unburden himself, to seek empathy and emotional support, and perhaps in some instances to seek practical guidance (e.g., legal advice). Nothing in the record suggests that Cox confessed to A.A. members "for the purpose of obtaining spiritual guidance." *Carmona*, 82 N.Y.2d at 609, 606 N.Y.S.2d at 882, 627 N.E.2d at 962. Under New York State law, the statements made by Cox therefore do not fall within the scope of § 4505, even assuming that A.A. is "a religion" to which the cleric-congregant privilege ordinarily would apply.[15]

## C. Considerations of Policy: An "A.A. Privilege"

In response to Cox's conviction, "[n]umerous self-help groups ... expressed outrage." Jessica G. Weiner, Comment, *"And the Wisdom to Know the Difference": Confidentiality v. Privilege in the Self-Help Setting*, 144 U. Pa. L.Rev. 243, 244 (1995); *see also* Jan Hoffman, *Faith in Confidentiality of Therapy is Shaken*, N.Y. Times, June 15, 1994, at A2; Jimmy Breslin, *Without a Shield, AA May Not Survive*, Newsday, June 14, 1994. While

---

matched his palm prints to those found at the crime scene and that those six would have been available to testify against Cox at trial.

**15.** Cox does not argue that New York's cleric-congregant privilege is unconstitutional because it requires communications to be made for the purpose of obtaining spiritual guidance. He does argue that the Establishment Clause requires New York State to extend the privilege to "less traditional forms of religious expression, such as confessions made to non-paid fellow-observers of a non-traditional, non-hierarchical faith." Appellee's Br. at 28–29; *see also id.* at 30 (arguing that New York's legislature may not require a "professional" clergy-congregant relationship to ex-

ist). Because we hold that Cox's communications to fellow A.A. members fall outside § 4505's scope in any event, we do not reach the question whether the Establishment Clause would require New York State to extend its privilege, as the Third Circuit put it, "to comprehend communications to and among members of sects that denominate each and every member as clergy, proclaim that all communications have spiritual significance, or dictate that all communications among members, whether essential to and in furtherance of the purportedly privileged communication or not, shall be confidential." *In re Grand Jury Investigation*, 918 F.2d at 384 n. 13.

one witness who testified at Cox's trial reportedly remarked that "AA is not above the law," Breslin, *supra* (quoting "Ms. [sic] S"), others thought that the conviction threatened the confidentiality of A.A., a *sine qua non* of its therapeutic efficacy as a program for recovering alcoholics, *see id.* A priest, also an A.A. member, commented:

> The confidentiality at AA is almost the same as the confessional.... Good Lord, if you don't have it at an AA meeting, then we are all threatened.... [O]nce you make [A.A.] people talk about one thing, what is to stop the authorities from deciding that they can come around for anything, an income tax case. Therefore, is a double murder more important than the confidentiality of AA? There had to be a better way to solve this case.

*Id.* (quoting anonymous A.A. member and priest).

We repeat our observation in *DeStefano* that "[w]e have no reason whatever to doubt what we have been told: that A.A. is a vastly worthwhile endeavor; that it has saved the lives, health or well-being of thousands of Americans, at least in part because it requires participants" to engage in intensive religious self-reflection. *DeStefano*, 247 F.3d at 422. Cox may be a case in point. He testified that since joining A.A., he has never again consumed an alcoholic beverage. We also have no reason to doubt the importance of confidentiality of communication to the success of the A.A. program.

But our role is not to decide the policy issues that underlie the State of New York's legislative or judicial choice to adopt or reject such an evidentiary privilege—whether the confidentiality of A.A., and the social values it may promote, outweigh the State's interests in enforcing its criminal law and promoting the public's right to every person's evidence. Our role is strictly limited. We must decide whether the state court's refusal to shield Cox's communications with fellow A.A. members from disclosure, even though New York law protects certain kinds of disclosures between clergy and congregants, violates the Establishment Clause. We hold that it does not because, even if the Establishment Clause requires that some communications between A.A. members in some circumstances be protected by New York's cleric-congregant privilege, Cox's communications to fellow A.A. members do not qualify for such protection. We have neither the occasion nor the authority to consider the wisdom of that conclusion or the policy issues that may be relevant to New York's decision whether to protect the confidentiality of communications among members of A.A. Those considerations remain the exclusive province of New York State's legislature and governor in enacting state law,[16] and its courts in interpreting statutes and crafting common-law privileges.[17]

## CONCLUSION

Because Cox failed to establish that his communications to members of A.A. were

---

**16.** *Cf.* 42 U.S.C. § 290dd–3 (providing a qualified privilege to federal prisoners with respect to records of their "identity, diagnosis, prognosis, or treatment" in connection with alcohol-abuse recovery programs).

**17.** Professor Wigmore identified "four canons" by which the "propriety of [a common law] privilege may be tested": First, "[d]oes the communication originate in a confidence of secrecy?" Second, "[i]s confidentiality essential to the relation?" Third, "[d]oes the ... relation deserve recognition and countenance?" Fourth, "[w]ould the injury to the ... relation [caused] by compulsory disclosure be greater than the benefit to justice?" 8 J.H. Wigmore, *supra*, at 878.

made in confidence for the purpose of obtaining spiritual guidance, we hold that they are not privileged under well-established principles of New York law.[18] We therefore reverse and remand with instructions to the district court to vacate the writ of habeas corpus and dismiss the petition.

18. The district court held that Cox's "numerous remaining challenges to [his] conviction ... have been considered by this Court to the extent that any of them alone or together arise to a Constitutional level.... [They] are lacking in merit." *Cox II,* 154 F.Supp.2d at 793. We agree with the conclusion of the district court.