RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0374p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JANNISS VARNER,

    *Petitioner-Appellant,*

    *v.*

CLARICE STOVALL,

    *Respondent-Appellee.*

No. 06-1255

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 04-60210—Marianne O. Battani, District Judge.

Argued: July 18, 2007

Decided and Filed: September 11, 2007

Before: GIBBONS and SUTTON, Circuit Judges; BECKWITH, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** James Sterling Lawrence, Royal Oak, Michigan, for Appellant. Debra M. Gagliardi, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** James Sterling Lawrence, Royal Oak, Michigan, for Appellant. Janet A. VanCleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

---

## OPINION

SUTTON, Circuit Judge. A jury convicted Janniss Varner of assault with intent to commit murder after she hired a third party to shoot her abusive boyfriend. In her federal habeas petition, she claimed that the state courts (1) violated her rights under the Religion Clauses of the First and Fourteenth Amendments by admitting into evidence several journal entries that included prayers and an acknowledgment that she had tried to kill her boyfriend and (2) violated her Sixth and Fourteenth Amendment rights by refusing to allow her to introduce evidence of Battered Women's Syndrome in support of her theories of self-defense and provocation. Because she has not shown that the state courts unreasonably applied relevant Supreme Court precedent, we affirm the district court's denial of the petition.

---

[*]The Honorable Sandra S. Beckwith, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

I.

On November 27, 1995, Varner attempted to murder her abusive boyfriend, Alvin Knight, by hiring a third party to kill him. Knight arrived at Varner's mother's home that morning to pick up his young son. Varner's mother told him to go to the garage, where a man came up from behind Knight and "started shooting at him." JA 196. Knight wrestled the gun away from the man and turned it over to the police. Knight could not identify the shooter.

Two-and-a-half years later, someone shot and killed Knight outside of his apartment complex. Police searched Knight's apartment for clues to the murder and uncovered Varner's journals linking her to the 1995 shooting. The journals identified the gunman of the 1995 shooting and disclosed Varner's responsibility for arranging the attempted murder. The journals also revealed that Knight had raped, choked and abused her in the past and noted that, two days prior to the shooting, "[h]e raped me and tied me up for three hours." JA 226. Her entries also expressed her wish that Knight had died in 1995, her lack of remorse for her actions and her determination to kill him in the future. The entries often were addressed "Dear God," *see* JA 122–28, sometimes contained prayers of supplication and thanks, *see* JA 128 ("Lord, give me guidance and insight concerning what I need to do . . . ."); JA 213 ("Lord I do thank you for helping me. God I thank you for saving me and keeping me in my right mind."), and in places expressed her disillusionment with organized religion and church services, *see* JA 126–27.

Varner was charged with and convicted of assault with intent to commit murder for her involvement in the 1995 shooting. At trial, the court admitted into evidence excerpts from her journals but denied her proffer of expert testimony on Battered Women's Syndrome to support her theories of self-defense and provocation and denied a mitigation instruction on provocation, reasoning that theories of self-defense and provocation are not available in cases involving "hired" third-party shootings. Varner received a sentence of 13 to 20 years' imprisonment for her conviction. The Michigan Court of Appeals affirmed her conviction and the Michigan Supreme Court denied leave to appeal.

After denying her federal habeas petition, the district court granted her a certificate of appealability on two issues: (1) whether her rights under the Religion Clauses of the First Amendment were violated when the state court admitted her private journal entries and (2) whether her due-process right "to present a defense based upon provocation and self-defense was curtailed improperly." JA 120.

II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may grant Varner's habeas petition only if the state court rulings were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

A.

Varner argues that the state courts' application of Michigan's clergy-penitent evidentiary privilege violated her rights under the Religion Clauses of the First (and Fourteenth) Amendment— "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. In doing so, she makes the following four-step argument. Step one: Michigan has created an evidentiary privilege for religious communications. Step two: the privilege applies only to religions that encourage their members to communicate with God through an intermediary. Step three: this limitation discriminates among religions because it disfavors belief systems in which individuals communicate directly with God. Step four: the solution to this First Amendment problem is not to strike the privilege (which would not benefit Varner) but to extend

it to all religions, including those that do not use intermediaries, and thus to extend the privilege to any journal entry that might be construed as a prayer to God.

While we accept some of the premises of Varner's argument, we cannot accept her conclusion. A State, it is true, may not "enact[] laws that have the purpose or effect of advancing or inhibiting religion," *Zelman v. Simmons-Harris*, 536 U.S. 639, 648–49 (2002) (internal quotation marks omitted); *see McCreary County v. ACLU*, 545 U.S. 844, 860 (2005). And a State, it is also true, may not "officially prefer[]" "one religious denomination . . . over another," *Larson v. Valente*, 456 U.S. 228, 244 (1982), a requirement that has roots in the Establishment and Free Exercise Clauses, *see id.* at 244–45; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). But the clergy-penitent privilege was never designed to apply to private journal entries, and the confinement of the privilege to its historic purposes does not offend these or any other requirements of the Religion Clauses of the First Amendment.

Recognized as early as the fifth century, the clergy-penitent privilege "originated" with the "Catholic sacrament of Penance," though it "fell into desuetude after the Reformation." *Cox v. Miller*, 296 F.3d 89, 102 (2d Cir. 2002). In the earliest known American case concerning the privilege, a New York court recognized a nonstatutory privilege resting in the clergy person, who is caught "between Scylla and Charybdis": "If he tells the truth he violates his ecclesiastical oath—If he prevaricates he violates his judicial oath . . . . The only course is, for the court to declare that he shall not testify or act at all." *People v. Phillips* (N.Y. Ct. Gen. Sess. 1813), *reprinted in Privileged Communications to Clergymen*, 1 Cath. Law. 199, 201, 203 (1955); *see Developments in the Law—Privileged Communications*, 98 Harv. L. Rev. 1450, 1556 (1985). Today every State has enacted some form of the clergy-penitent privilege. 1 McCormick on Evid. § 76.2 (6th ed.). Although the scope of the privilege varies from State to State, *see Cox*, 296 F.3d at 102, all States at a minimum "require that the communications be made in private, with an expectation of confidentiality, to a minister in his or her professional capacity as a member of the clergy." R. Michael Cassidy, *Sharing Sacred Secrets: Is it (Past) Time for a Dangerous Person Exception to the Clergy-Penitent Privilege?*, 44 Wm. & Mary L. Rev. 1627, 1645 (2003) (citations omitted).

Michigan has codified its clergy-penitent privilege, which appears in two statutes. One says: "Any communications . . . between . . . members of the clergy and the members of their respective churches . . . are hereby declared to be privileged and confidential when those communications were necessary to enable the . . . members of the clergy . . . to serve as such . . . member of the clergy . . . ." Mich. Comp. Laws § 767.5a(2). The other says: "No minister of the gospel, or priest of any denomination whatsoever, or duly accredited Christian Science practitioner, shall be allowed to disclose any confessions made to him in his professional character, in the course of discipline enjoined by the rules or practice of such denomination." *Id.* § 600.2156.

One of the two statutes, section 767.5a, does not apply just to religious communications. By its terms, it also applies to communications "between attorneys and their clients . . . and between physicians and their patients." *Id.* § 767.5a(2). The statute thus operates in secular and sectarian settings linked by a common purpose—the everlasting need of the individual to seek spiritual and worldly assistance from others on a confidential basis. *See Trammel v. United States*, 445 U.S. 40, 51 (1980) ("The privileges between priest and penitent, attorney and client, and physician and patient . . . are rooted in the imperative need for confidence and trust."); *In re Grand Jury Investigation*, 918 F.2d 374, 383 (3d Cir. 1990) ("[T]he privilege protecting communications to members of the clergy, like the attorney-client and physician-patient privileges, is grounded in a policy of preventing disclosures that would tend to inhibit the development of confidential relationships that are socially desirable.").

Just as the clergy-penitent privilege protects "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to

receive priestly consolation and guidance in return," *Trammel*, 445 U.S. at 51, so the "[t]he lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out," *id*., and so "the physician must know all that a patient can articulate in order to identify and to treat disease," *id*. "[B]arriers to full disclosure" in all three settings—including the barrier that would arise if the counselor could be called upon to testify against the counseled—would undermine the values served by these time-honored relationships. *Id.*

In view of this function of the privilege, neither Michigan nor any other State (to our knowledge) treats the clergy-penitent privilege as a broad cloak protecting *all* religious communications. *See* Mich. Comp. Laws § 600.2156 (requiring the communication to be made to clergy in his or her "professional character"); *id.* § 767.5a(2) (requiring a "communication[] between . . . members of the clergy and the members of their respective churches . . . when those communications were necessary to enable the . . . members of the clergy . . . to serve as" clergy); *see also* Cassidy, *supra*, at 1645 ("All states require that the communications be made in private, with an expectation of confidentiality, to a minister in his or her professional capacity as a member of the clergy.") (citations omitted). Because the objective of the privilege is to protect the "human need" to place "total and absolute confidence" in a spiritual counselor without risk that the law will extract those confidences from the counselor, the Michigan Court of Appeals had ample reason to hold that privilege does not apply to "private writings." *People v. Varner*, No. 224865, 2002 WL 741531, at *1 n.1 (Mich. Ct. App. Apr. 23, 2002). The privilege requires the communication to be directed to a member of the clergy—just as the other privileges require the communication to be directed to an attorney or doctor—because it is the clergy who may be subpoenaed to testify against the individual. The same possibility does not exist with private writings to God, who may be petitioned but never subpoenaed.

*Cox v. Miller*, 296 F.3d 89 (2d Cir. 2002), reached a similar conclusion in construing New York's clergy-penitent privilege. Cox argued that statements to other members of Alcoholics Anonymous should have been suppressed under New York's clergy-penitent privilege and claimed "that New York's privilege officially discriminates against the 'religion' of A.A." *Id.* at 101. It was not necessary, the Second Circuit explained, to decide whether the Establishment Clause applies to communications between members of A.A. because the communications failed to meet a threshold requirement under state law: Cox did not speak with other members "'for the purpose of obtaining spiritual guidance'" but "primarily to unburden himself, to seek empathy and emotional support, and . . . practical guidance." *Id.* at 111 (quoting state law). *Cox* thus held that the privilege did not extend to *all* religious communications, just those consistent with the traditional purpose of the privilege.

Varner does not argue that a privilege for communications between a spiritual counselor and a congregant improperly advances religion, presumably because that argument would not help Varner. The prototypical way to remedy a law that unconstitutionally advances religion in general is to strike the law, not to *extend* it so that it advances other religions. *See, e.g.*, *Bd. of Educ., Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 710 (1994) (striking down state statute that carved out a special school district to serve a religious enclave); *Texas Monthly v Bullock*, 489 U.S. 1, 17 (1989) (plurality opinion) (striking down a sales-tax exemption for religious periodicals); *see also County of Allegheny v. ACLU*, 492 U.S. 573, 602 (1989) (enjoining the display of a creche rather than expanding the display); *Wallace v. Jaffree*, 472 U.S. 38, 61 (1985) (striking down a moment-of-silence statute). What Varner argues is something different—that the law improperly favors religions that encourage their members to seek guidance through intermediaries, such as a pastor or priest, over faiths that have no such tradition.

The confinement of the privilege to its traditional function, however, does not favor some religions over others. No matter what form of faith an individual practices, the privilege does not

protect journal entries, whether addressed to God or not. If a Catholic confesses to a priest *and* proceeds to repeat everything she said in confession in "Dear God" entries in her journal, the privilege protects only the first communication, not the second one. *See* Mich. Comp. Laws § 600.2156 (requiring the communication to be made to a cleric in his or her "professional character"); *id.* § 767.5a(2) (requiring a "communication[] *between . . . members of the clergy* and the members of their respective churches") (emphasis added); *cf. Mullins v. State*, 721 N.E.2d 335, 338 (Ind. Ct. App. 1999).

Nor can Varner tenably maintain that this limitation on the privilege restricts her ability to practice her faith. Journal writings do not represent the *only* way she may communicate with God, even if she remains a skeptic when it comes to organized religion. Like members of any faith, she remains free to let life's challenges take her to her knees—and seek God's guidance and comfort in the most common and commonly accepted form of prayer.

Neither is it the case that a State discriminates against every individual who fails to meet a statutory requirement for a religious benefit. A person of faith who like Varner chooses not to join an organized religion cannot complain that the State's and Federal Government's tax exemptions for property held by religious institutions and other non-profit organizations discriminate against her—even though her faith will not benefit from the exemptions. *See Walz v. Tax Comm'n*, 397 U.S. 664, 680 (1970) (holding that such exemptions do not violate the Establishment Clause). Nor can parents of children who attend public schools with "release time" programs—which allow students to leave school to attend religious classes—complain that the programs discriminate against them simply because they do not subscribe to a denominational faith that offers such classes. *See Zorach v. Clauson*, 343 U.S. 306, 312–15 (1952); *cf. Arlan's Dept. Store v. Kentucky*, 371 U.S. 218 (1962) (per curiam).

Varner does not alter this conclusion by invoking cases standing for the general proposition that the Establishment Clause mandates government neutrality in religious practice. *See, e.g.*, *Epperson v. Arkansas*, 393 U.S. 97, 103–04 (1968) ("Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice.") (invalidating state law that restricted the teaching of evolution theories that conflicted with the Bible); *see also Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 215–17 (1963) (prohibiting public schools from requiring morning prayer and Bible readings as part of the curriculum); *Everson v. Bd. of Educ.*, 330 U.S. 1, 15–18 (1947) (upholding state law that provided free transportation to students of public and parochial schools). The decision of Michigan not to extend the privilege to private writings, as we have shown, *is* neutral. Whether a Protestant, Muslim or Atheist pens the journal entries, the State does not protect them. Whether the content of the journal entries is deeply spiritual, agnostic or thoroughly nihilistic, the state does not protect them. Whether Mother Teresa, C.S. Lewis, Ayn Rand or Janniss Varner authors the entries, the State does not protect them. *Epperson*, *Schempp* and *Everson*, in short, do not begin to reach "conduct of the kind involved here" and therefore the state court was not unreasonable in failing to extend their holdings to the clergy-penitent privilege. *See Carey v. Musladin*, 127 S. Ct. 649, 654 (2006).

Varner's analogy to *Larson v. Valente*, 456 U.S. 228 (1982), does not help. Observing that the Establishment Clause prohibits "one religious denomination" from "be[ing] officially preferred over another," *id.* at 244, *Larson* held that a reporting and registration requirement unconstitutionally favored established religious denominations over non-established denominations through a "fifty percent rule" that exempted religious organizations that receive more than half of their total contributions from members, *id.* at 246–55. Varner argues that the clergy-penitent privilege similarly favors institutionalized religions that use intermediaries in their worship over religions that do not. But, as we have shown, this privilege applies in secular and sectarian settings and restricts all religions from obtaining a benefit for private spiritual (or for that matter private secular) writings. Rather than "focus[ing] precisely and solely upon *religious organizations*," *id.* at 246 n.23 (emphasis

added), the privilege provides a limitation on the *manner* in which an individual of any religious denomination may seek spiritual guidance and still retain the confidentiality of the communication.

The better analogy is to *Gillette v. United States*, 401 U.S. 437 (1971), which upheld a federal law affording conscientious-objector status to those who object to all wars (*e.g.*, Quakers and Mennonites) but not to those who object to particular wars (*e.g.*, Roman Catholics, who object only to "unjust" wars). *Id.* at 441. The law did not discriminate between religious denominations because it permissibly "focused on individual conscientious belief, not on sectarian affiliation." *Id.* at 454. Like the conscientious-objector statute, Michigan's privilege rules do not discriminate between denominations but distinguish between the methods of communication that the individual—any individual of any faith or no faith—chooses to pursue. Michigan courts did not unreasonably apply *Larson* and *Gillette* in declining to extend the clergy-penitent privilege to this setting.

B.

Varner also challenges the state court's refusal to permit her to introduce certain evidence of self-defense and provocation, contending that the restrictions violated her Sixth and Fourteenth Amendment rights to present a defense. Her principal concern is that the state courts refused to allow evidence of Battered Women's Syndrome in a murder-for-hire situation and refused to allow her to submit a mitigation instruction on provocation.

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), including the right "to present relevant evidence . . . subject to reasonable restrictions," *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also Washington v. Texas*, 388 U.S. 14, 23 (1967). In subjecting this guarantee to "reasonable restrictions," the right must "bow to accommodate other legitimate interests in the criminal trial process." *Scheffer*, 523 U.S. at 308. One such interest is this: "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials" so long as the rules do not "infring[e] upon a weighty interest of the accused" and are not "arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (internal quotation marks omitted). In view of the imperative of preserving federal-state comity, federal courts will not step in to override a State's application of its own evidentiary rules unless the State "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *See Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (internal quotation marks omitted).

1.

Any right to present a theory of self-defense requires at a minimum that the theory be "supported by the evidence," *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002), which under Michigan law requires the defendant to show that she "honestly and reasonably believes that [her] life is in *imminent danger* or that there is a threat of serious bodily harm," *People v. Heflin*, 456 N.W.2d 10, 18 (Mich. 1990) (emphasis added); *see Barker v. Yukins*, 199 F.3d 867, 875–76 (6th Cir. 1999) (holding that a court's refusal to provide a self-defense instruction under Michigan law violated petitioner's rights where she murdered a man to resist an imminent rape). In this case, the Michigan courts determined that, when an individual hires a contract killer, the evidence does not support a defendant's belief that she was "in imminent danger or that there is a threat of serious bodily harm." "[S]elf-defense," the courts concluded, "is not available to repel a potential force." *Varner*, 2002 WL 741531, at *1; *cf. Lannert v. Jones*, 321 F.3d 747, 755 (8th Cir. 2003) (upholding trial court's refusal to instruct the jury on self-defense where a daughter killed her abusive father in his sleep because the father was not the initial aggressor and therefore the elements of self-defense were not met). Much as we sympathize with Varner's plight, we must conclude that the confinement

of self-defense instructions to cases of "imminent danger" does not unreasonably apply Supreme Court precedent, and neither does the state courts' conclusion that a scheme to hire a contract killer does not involve such an imminent danger.

2.

As is the case with self-defense, a court is required to permit a theory of provocation only if the theory is material to the dispute. *See Scheffer*, 523 U.S. at 308. Varner argues that admitting evidence of, and permitting an instruction on, provocation would have negated the requisite intent for assault with intent to commit murder. *See People v. Pouncey*, 471 N.W.2d 346, 349–50 (Mich. 1991); *People v. Lipps*, 421 N.W.2d 586, 590 (Mich. Ct. App. 1988). Michigan defines provocation as "that which causes the defendant to act out of passion rather than reason" and requires that the provocation be "adequate"—which is to say, it must "cause a reasonable person to lose control." *People v. Sullivan*, 586 N.W.2d 578, 582 (Mich. Ct. App. 1998) (internal quotations and emphasis omitted).

The Michigan courts acted reasonably when they held that Varner, in hiring a contract killer, did not "act out of passion" based on an event that would "cause a reasonable person to lose control." *Cf. Arreola v. Garcia*, 43 F. App'x 130, 130 n.1 (9th Cir. July 30, 2002). Whether it is a question of self-defense or a question of provocation, Varner fails to explain why an individual who faces a nonimminent threat is not just as capable of calling the authorities as of hiring a contract killer. Allowing the state courts to define the scope of provocation in this way was not "arbitrary or disproportionate," did not "infringe[] upon a weighty interest of the accused," *Scheffer*, 523 U.S. at 308 (internal quotation marks omitted), and did not violate a right that is "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Egelhoff*, 518 U.S. at 43. The Michigan Court of Appeals' decision therefore was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

III.

For these reasons, we affirm.