Scott WYNNE, Petitioner,

v.

Paul RENICO, Respondent.

Case No. 01–10247–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Jan. 23, 2009.

Supplementing 279 F.Supp.2d 866.

John R. Minock, Cramer and Minock, Ann Arbor, MI, for Petitioner.

Brad H. Beaver, Michigan Department of Attorney General, Lansing, MI, for Respondent.

*SUPPLEMENT TO OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS*

DAVID M. LAWSON, District Judge.

In 1995, the petitioner was convicted in a Michigan state court of murdering Philip Timmerman in a dispute over a piece of land the petitioner's family owned and Mr. Timmerman leased. The petitioner filed a petition for writ of habeas corpus in this Court through counsel, arguing, among other things, that his constitutional rights were violated because the state court refused to allow him to introduce certain evidence that tended to show that Mark Peckham, the State's principal witness against the petitioner, actually committed the murder and framed the petitioner. The Court conditionally granted the petition. The Court observed that the right to present witnesses in one's defense was clearly established as a fundamental element of due process to which certain state evidentiary rules must yield. The Court then held that the state trial court violated the petitioner's right by excluding exculpatory evidence based on its application of state evidence rules, which the trial court did not apply correctly, and that the excluded evidence would have substantially influenced the jury's decision.

Shortly after the opinion granting the writ was filed, the Court was notified that the petitioner's first brief contained factual inaccuracies that may have influenced the Court's decision. The Court stayed the order granting the writ and permitted the parties to submit supplemental briefs addressing the factual inaccuracies. The Court has carefully examined the record again in light of the parties' supplemental submissions. The Court concludes that although there are discrepancies between the description of the facts in the petitioner's brief and the record (to which the respondent originally acquiesced), the Court remains convinced that evidence excluded from the petitioner's trial resulted in a denial of his constitutional rights under the Due Process Clause and the Sixth Amendment, and the state courts' conclusions otherwise constituted an unreasonable application of clearly established federal constitutional law as determined by the Supreme Court.

I.

The facts of the case are recounted in the Court's original opinion, *Wynne v. Renico,* 279 F.Supp.2d 866, 868–75 (E.D.Mich.2003). These facts were taken from the record, viewed through the lens of the petitioner's brief drafted by his attorney, who continues to represent him. The respondent, represented by the state attorney general, filed a response to the petition, which took no issue with the factual representations in the opening brief. In fact, it appears that the attorney general merely copied the statement of facts from the state prosecutor's brief filed in the state appellate court, and it was not until the Court filed its opinion that the respondent read the record. Thereafter, the petitioner's attorney acknowledged the inaccuracies in his representations to the Court, which focus primarily on four areas. The respondent contends that some additional arguments by the petitioner misapprehends the State's trial theory and did not represent the record in the light most favorable to the State.

First, the initial brief stated that Mark Peckham showed an unregistered gun to his ex-girlfriend, Melissa Hill, and threatened to kill her if she told her family about the gun. In fact, Peckham threatened to kill himself, not Ms. Hill, if she told her family about the gun. However, he did threaten to kill her on another occasion. Hill testified:

Q. Okay. Did he [Peckham] ever show you a hand gun that he had?

A. Yes, he did.

Q. Did he tell you that he got it from anyone? Who did he tell you that he got it from?

A. I recall a hitchhiker, that's what I have in my mind.

Q. What did he say when he showed you the gun?

A. He had told me that he picked it up from a hitchhiker and I was going to tell his family that he had it and he told me that if I told anyone that he had it that he would kill himself.

Q. Did he ever threaten to kill you?

A. Yes.

Q. On more than one occasion?

A. Yes.

. . .

Q. Was there another thing that he told you never to tell and if you told that he would kill you?

A. Yes.

Q. What is that?

A. He—

Q. What did he do?

A. He took females' underwear.

Trial Tr. vol. IX, 297–98, Oct. 30, 1995.

Second, the initial brief stated Peckham confessed to Melissa Hill that he had burned down their trailer after they broke up. This is not true. Peckham did not admit that he burned down the trailer. Rather, it was Hill who suspected him of doing so. Hill testified as follows:

Q. Now Missy, at some point you broke up with Mark [Peckham]. Is that correct?

A. Yes, I did.

Q. Within 24 hours of breaking up with him what happened?

A. I recall it within 24 hours, that's what it seems like to me.

Q. Okay.

A. His trailer, the trailer that we stayed at, burnt down.

Q. Did he ever admit to you that he burned the trailer down?

A. No, he did not.

Trial Tr. vol. IX, 301, Oct. 30, 1995.

Third, the initial brief stated that Peckham was at the petitioner's house the day of the murder. Actually it was two days before the murder. Peckham testified at the trial:

A. ... Then on Tuesday the following week I stopped and looked at the lawn mower again, to just look at it.

Q. The lawn mower was at the Wynne residence when stopped on Tuesday?

A. Yes.

Q. Was that two days before the shooting?

A. The shooting happened on—yes, it was two days.

Q. The shooting happened on the 18th, a Thursday, just to help you.

A. It was on the 16th that I had stopped there. . . .

Trial Tr. vol. VI, 51, 53, Oct. 24, 1995.

The respondent makes much of this discrepancy, arguing that the difference in those facts severely weakens one pillar supporting the theory that Peckham framed the petitioner. The respondent states the petitioner told the police during an interview that his .45 pistol was "definitely" in his bedroom two nights prior to the murder. Detective O'Reilly did testify that the petitioner "stated that it [the gun] had definitely been there two nights before." Trial Tr. vol. IV, 15, Oct. 19, 1995. This would directly contradict the petitioner's claim that Peckham stole the gun from the petitioner's house on the day of the

murder since Peckham was not there that day, or that he stole it on his visit two days prior since the gun was still there after Peckham's visit.

On this point, it appears that it is the respondent that is taking creative license with the record. The petitioner denied telling Detective O'Reilly that the .45 was "definitely" on his bed post two nights before the murder. Although Detective O'Reilly did, in fact, testify that the petitioner made such a statement, a transcript of the interview reveals that Detective O'Reilly was wrong. O'Reilly said several times that the petitioner saw the gun two nights before, but the petitioner never made that statement. The interview transcript reads:

> WYNNE: My forty[-]four is on the right and my forty[-]five is on the left, right by the night stand.
>
> O'REILLY: Up by your head?
>
> WYNNE: Yep, there's one on each side. (O'REILLY exits a moment) (pause for a few minutes) (DETECTIVE O'REILLY re-enters)
>
> O'REILLY: Excuse me, I don't know how to tell you this partner, but you're [sic] gun isn't there.
>
> WYNNE: It was there, I don't know if it was there last night, but it was there this weekend, this last weekend.
>
> O'REILLY: That forty[-]four is there, the forty[-]five isn't.
>
> WYNNE: It was hanging right on the left side of the bed post. That's where it always hangs. I take it over to NOR, I spend the weekends over at my girlfriend's house, and I take it over to her house sometimes on the weekend.
>
> O'REILLY: You're sure it's not there?
>
> WYNNE: Yep.
>
> . . .
>
> O'REILLY: Two nights ago you know for a fact it was there, you don't remem-

ber within the last day, taking the forty[-]five in a shoulder rig, doing something with it?

> WYNNE: I, I never do anything with it. Like I said, I take it over to NORMA'S on the weekends.
>
> . . .
>
> WYNNE: O.K., well I've got a lot of other guns. I can give you a detailed list of every gun I've got. It was there PAT. I, I had it at NORMA'S. I don't remember if I had it last weekend, but I know I had it the weekend before.
>
> O'REILLY: When was the last time you had it at NORMA'S?
>
> WYNNE: It was either last weekend or the weekend before.
>
> O'REILLY: But you also said that two nights ago, it was hanging on your bed post.
>
> WYNNE: I'm fairly certain it was. I always check to make sure there's a gun hanging on my bed post, before I go to bed.
>
> O'REILLY: So, did you check last night?
>
> WYNNE: I don't know if I did last night.

App. 11 to Pet. for Writ at 82, 84–85.

Fourth, and perhaps most importantly, the initial brief represented that after Timmerman was killed, Peckham told Kathy Hinson that he had done something so wrong that if the police ever found out he would go to prison for life and that hunting men was more fun that hunting animals. However, in fact Ms. Hinson would have testified that Peckham made these statements to her six months *before* the murder, not after the murder, and therefore they could not have been a reference to the murder of Mr. Timmerman. Ms. Hinson was prepared to testify that she worked with Peckham in November or De-

cember 1994, six months before the murder, and that

> Mark Peckham has said to her that he has done something so bad in his past that if the police ever found out about it he would go to prison for life. He also has made statements to her that if—that he plays paintball because it's more fun to hunt men than animals. He repeated the statement about going to prison for life twice to her.

Trial Tr. vol. X, 92–93, Oct. 31, 1995. It is not clear from the record when Peckham made the statements to her. The trial court sustained the State's objection to the introduction of that evidence. The petitioner's attorney asked to have Ms. Hinson testify to these facts outside the jury's presence, but the judge ruled that this was not necessary: "Let's conserve time here and I'll accept your statement as to what her testimony will be. You can go on without objection. Why don't you just state it on the record." *Id.* at 92.

Next, the respondent states the petitioner's brief mis-stated the prosecution's theory of motive, which concerned the terms of the land lease between the victim and the petitioner's family. However, the Court was not misled by that argument. The respondent also claims that Peckham has an alibi for the Timmerman murder. He says that Amy and Jack Madelinski, Peckham's sister-in-law and father-in-law, testified that Peckham was at their house the night of the murder, leaving between 10:30 p.m. and 10:35 p.m. to go to work. Peckham is seen on his employer's security camera arriving at work at 10:50 p.m. The murder was committed between 10:22 and 10:37 p.m. However, Ms. Madelinski's testimony about Peckham's departure time was equivocal. She testified that he "probably" left around 10:35 p.m. because "he usually just didn't leave very early" and he didn't have to be to work until 11

p.m. Trial Tr. vol. XI, 274, Nov. 1, 1995. Likewise, Mr. Madelinski testified that Peckham "generally leaves to work about I'd say 10:30 or twenty-five minutes to 11:00." *Id.* at 276–77. Mr. Madelinski did not know what time Peckham left for work that specific night.

The respondent also states that the petitioner failed to discuss evidence that inculpated him. For instance, the respondent points to evidence that the petitioner and the victim had an argument the day of the murder. Benny Koteras testified that he stopped by the petitioner's house the night of the murder and found the petitioner target practicing in the yard. Mr. Koteras told the petitioner he had just seen the victim working in the field. The petitioner told Mr. Koteras that he had "words" with the victim earlier that day. The petitioner appeared angry, and Mr. Koteras believed he was angry about the disputed land. Mr. Koteras testified that the petitioner was using a .22 pistol. The victim was shot one time with a .22. However, the petitioner states all of his firearms were accounted for, including the .22 he was shooting that day, and none were found to match the .22 bullet recovered from the victim's body. Detective O'Reilly testified as follows:

> Q. When did you become aware that a .22 that apparently was used in the shooting had not been recovered by the Sheriff's Department?
> A. After Mr.—or Sergeant Michael Burritt came out from the Michigan State Police Crime Lab and had analyzed the guns that had been provided to him via a search warrant. We were then advised that the bullets that were recovered—let me revise that—Sergeant Burritt did an analysis; shortly after he did an analysis we were informed that he did not have the .22 that was used to shoot Mr. Timmerman.

Q. Did you testify yesterday that you got all of Scott's long guns that he told you about; is that what I heard you testify?

A. It's my understanding that we got all the long guns that were there that night.

Q. None of those generated the .22 that was used to shoot Mr. Timmerman?

A. That is correct.

Trial Tr. vol. IV, 30–31, Oct. 19, 1995.

The respondent also states that the petitioner did not mention evidence that placed him at the murder scene. The respondent makes reference to the testimony of Beau Preston, who lived near the murder scene, who testified that he saw a truck driving very quickly down 118th Avenue towards the petitioner's house sometime after 10 p.m. the night of the murder. The witness identified a picture of the petitioner's truck as possibly the truck he saw:

Q. Something happened that night, right? That got your attention?

A. Yeah.

Q. Okay. What was it that got your attention?

A. What do you mean? What I gave a statement about?

Q. Yeah, that's—you made a statement about this before to some other people, right?

A. Yeah, it was—well, my mom was upstairs at this time and we heard acceleration from an automobile truck. We looked up and we saw a truck or whatever....

Q. And, do you have any idea about what time it was that this happened?

A. Not really. It was past ten o'clock.

. . .

Q. Did you tell Detective O'Reilly that originally you didn't think—when he showed you this picture [of the petitioner's truck], originally you didn't think that that was the pickup?

A. No, I said that could possibly be the pickup or it could—it might not be the pickup.

Q. Okay.

A. The same thing—

Q. Pardon?

A. The same thing I'm saying. It could possibly 'cause it's got the same features as I've explained, but it might not be the pickup.

Trial Tr. vol. VI, 225, 227, 238, Oct. 24, 1995.

However, Beau Preston and his mother Sharon Bellingar originally told Officer Ross that the truck went by around 9:30 p.m.:

Q. And, did you interview or speak with a Beau Preston at that time?

A. Yes.

Q. Did you recall that he believed he saw a brown truck around 9:30 p.m.?

A. On the evening before he saw the truck, yes.

Q. Do you recall the time that he said?

A. He believed it was around that time because it was just getting kind of twilight, dusk.

Q. Did you recall writing 9:30 in your police report?

A. Yes.

. . .

Q. Did you later interview a Mrs. Sharon Bellingar?

A. Yes, I did.

Q. And, in talking to her do you recall her stating that approximately 9:30 or shortly thereafter she and her son were upstairs in her house and saw a truck?

A. Yes.

Q. So, you recall the time that she said as well would be 9:30.

A. Yes.

Trial Tr. vol. IX, 200–02, Oct. 30, 1995. The petitioner further notes that Beau Preston's testimony was that the petitioner's truck might or might not be the truck he saw.

The respondent concludes by contending that all of the petitioner's issues ought to be relegated to disputes over state evidentiary rulings. Those, he insists, are too insubstantial to justify the issuance of a writ under 28 U.S.C. § 2254(d), and he believes that the Sixth Circuit's decision in *Rockwell v. Yukins*, 341 F.3d 507 (6th Cir.2003), controls.

## II.

 Certainly, mere errors in state evidence law will not support a claim that a prisoner is in custody in violation of the Constitution or laws of the United States. This Court acknowledged that rule in its original opinion, when it stated:

> To be sure, errors in state evidence law will not support the issuance of the writ unless those errors rendered the trial fundamentally unfair. See *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir.1994) (holding that "[h]abeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation"). The Court of Appeals for the Sixth Circuit has explained that
>
>> "[e]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988). Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be

ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)); *see also Spencer v. Texas*, 385 U.S. 554, 563–64, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

*Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.2000), *cert. denied*, 532 U.S. 989, 121 S.Ct. 1643, 149 L.Ed.2d 502 (2001) (second alteration in original). However, this Court finds that the petitioner has raised an issue of constitutional dimension that was neither properly addressed nor correctly decided by the state courts: the right to present a defense incorporated in the Sixth Amendment.

*Wynne v. Renico*, 279 F.Supp.2d at 879. However, the thrust of the Court's earlier opinion was on the Sixth Amendment's basic guarantee of "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). This Court observed that an accused has the right at trial to present testimony that is "relevant," "material," and "vital to the defense." *Washington v. Texas*, 388 U.S. 14, 16, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). *See also Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or ·Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense' ") (internal citations omitted).

The Court also discussed the point that the "right to present relevant evidence is not unlimited," and "is subject to reasonable restrictions" imposed by the criminal process. *United States v. Scheffer*, 523

U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

> As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*Ibid* (citations and quotation omitted). The state courts's opinions in this case never addressed the concept of proportionality established by the Supreme Court. And it is that point that distinguishes this case from *Rockwell v. Yukins* and a later case on the same point, *Varner v. Stovall*, 500 F.3d 491 (6th Cir.2007).

*Rockwell v. Yukins* held that a state's decision to exclude evidence that a victim of a crime had sexually abused his children because its probative value was outweighed by the possibility of unfair prejudice was not an unreasonable application of Supreme Court case law. The petitioner in that case was convicted of conspiring with her sons to kill her husband, their father. The trial court excluded evidence that the victim had sexually abused his sons, the petitioner's alleged coconspirators. The district court granted the writ on the grounds that the petitioner's Sixth Amendment right to present a complete defense had been violated. The Sixth Circuit, en banc, reversed the grant of the writ, with four judges dissenting.

The actual attempt to murder the victim was committed by one of the sons and two of his friends. However, the petitioner had "engaged in discussions with one or more of her sons about killing Mr. Rock-

well. On the strength of these discussions, the State of Michigan charged Mrs. Rockwell with conspiracy to commit murder." *Rockwell,* 341 F.3d at 509. The petitioner's defense was that the talk of killing the victim was "some sort of talk therapy" to help her sons deal with their hatred of their father, not any agreement to actually murder him. The state trial court held that the evidence of abuse was not material under state evidentiary rules. The state court of appeals affirmed, stating that the probative value of the abuse was substantially outweighed by the danger of unfair prejudice. On appeal to the Sixth Circuit, the petitioner did not argue that the state court decision was "contrary to" Supreme Court case law. Instead, she argued that the state court decision was an "unreasonable application" of the law. The Sixth Circuit rejected this argument, noting the difference between an unreasonable application of the law and a mere incorrect or erroneous application of the law. The court did not believe the Michigan Court of Appeals decision finding that the probative value of the evidence was outweighed by its prejudice was objectively unreasonable:

> A defendant's right to present a "complete" defense, in other words, does not automatically trump state evidentiary rules. The competing interests must be balanced, and "a defendant's interest in presenting ... evidence may [have to] bow to accommodate other legitimate interests in the criminal trial process." *Id.* (Internal quotation marks and citations omitted.)

It was not objectively unreasonable, in our view, for the Michigan court to conclude that "other legitimate interests in the criminal trial process" outweighed Mrs. Rockwell's interest in presenting evidence of her husband's prior conduct. The evidence of sexual abuse posed a substantial danger of unfair prejudice—

a risk that the jury would be tempted to acquit Mrs. Rockwell not because of any sense that she was innocent of conspiring with her sons to kill Mr. Rockwell but because of a sense that killing would be too good for such a man.

*Rockwell,* 341 F.3d at 513. *Rockwell* cites *United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), the case noted above.

In my original opinion, I summarized the Michigan Court of Appeals decision in the present case, dealing with evidentiary matters that the State does not challenge presently, as follows:

> In this case, the state court of appeals held that evidence of Peckham's conduct toward his former girlfriend and her new boyfriend, and the evidence of his theft of women's undergarments, was impermissible propensity evidence excludable under the first sentence of Michigan Rule of Evidence 404(b), which states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

*Wynne v. Renico,* 279 F.Supp.2d 866, 883 (E.D.Mich.2003). I concluded that the state court decision was an unreasonable application of Supreme Court law and conditionally granted the petition, stating:

> It is clear that the defendant's right to present evidence is not absolute, and that the State may place reasonable limitations on the introduction of evidence in criminal proceedings. *See, e.g., United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (holding that the proscription against the introduction of polygraph examination results contained in Military Rule of Evidence 707 did not violate the Due Process Clause). However, the unavoidable conclusion to be drawn from the Supreme Court's cases is that the

> "the right to present ... witnesses to establish a defense" is clearly established as "a fundamental element of due process of law." *See Washington,* 388 U.S. at 19, 87 S.Ct. 1920. State evidence rules must yield to this fundamental right when they "plainly interfere[ ] with [the defendant's] right to defend against the State's charges," *Chambers [v. Mississippi],* 410 U.S. [284] at 298, 93 S.Ct. 1038 [35 L.Ed.2d 297 (1973) ] particularly when such rules are "disproportionate to the purposes they are designed to serve." *Rock [v. Arkansas],* 483 U.S. [44] at 56, 107 S.Ct. 2704 [97 L.Ed.2d 37 (1987) ]. A state court's interpretation of its evidence rules that results in the denial of the defendant's right to present a defense, most notably the defense of third-party culpability as in *Chambers,* especially when the state court interprets the evidence rules incorrectly, is an unreasonable application of this clearly established constitutional rule.

*Wynne v. Renico,* 279 F.Supp.2d at 882.

■ As the Sixth Circuit noted in *Rockwell,* a state must balance the defendant's right to present a complete defense against "other legitimate interests in the criminal trial process." *Rockwell,* 341 F.3d at 513. Only if the state's balancing is unreasonable can a habeas petition be granted. It would be objectively unreasonable for the Michigan courts to conclude that the state's interest in enforcing Michigan Rule of Evidence 404(b) outweighed the defendant's right to present evidence that a third person, namely the prosecution's chief witness, committed the crime. The state's interest in enforcing Rule 404(b) is much weaker in this case than the interest of the state in *Rockwell.* In *Rockwell,* the state's interest was in preventing jury nullification or the sanctioning of vigilante justice against a child

molester or abuser. The court found that the state could reasonably conclude that this interest "outweighed Mrs. Rockwell's interest in presenting evidence of her husband's prior conduct." *Ibid.* In *Wynne*, however, the State's interest in preventing the admission of information about Mr. Peckham will not withstand the counterweight of the Sixth Amendment and the Due Process Clause. It would be unreasonable for the State to conclude that this interest outweighed Mr. Wynne's right to present evidence that Mr. Peckham was the actual murderer.

Moreover, the state courts' decisions also are "contrary to" clearly established federal law. When the Michigan courts excluded the evidence on state law grounds, they applied Michigan law in a manner that is inconsistent with federal law. It is clearly established that state evidentiary rules must yield to constitutional rights and that state courts must balance the interests of the rule against the interests of the defendant. The state courts failed to do that in this case. The state court decisions therefore are contrary to federal law.

Nor does the case of *Varner v. Stovall*, 500 F.3d 491 (6th Cir.2007), require a different result. In that case, the petitioner was convicted of assault with attempt to murder her boyfriend when she hired another man, who shot the victim for her. Prior to the trial, the state trial court ruled that the petitioner could not present a defense of self-defense or any evidence of battered woman syndrome to support this defense. The court reasoned that, because the petitioner had used a third-party to commit the acts, she was not entitled to rely on self-defense or battered woman syndrome. The Michigan Court of Appeals affirmed, citing state-law precedent and holding that "rationale behind self-defense or mitigating circumstances does

not apply to a gun-for-hire situation such as occurred here." *People v. Varner*, 2002 WL 741531, at *1 (Mich.App. April 23, 2002).

The Sixth Circuit agreed with the district court that the petitioner was not entitled to habeas relief, first noting that "[a]ny right to present a theory of self-defense requires at a minimum that the theory be 'supported by the evidence.'" *Varner*, 500 F.3d at 499 (quoting *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir.2002)). "'[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials' so long as the rules do not 'infring[e] upon a weighty interest of the accused' and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" *Ibid.* (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (alterations in original)).

The court found that the petitioner simply had not alleged facts that would fall within the definition of self-defense or provocation under Michigan law, since under state law a self-defense theory requires proof of a belief that the defendant's life is in "imminent danger." *Ibid.* (quoting *People v. Heflin*, 434 Mich. 482, 500–01, 456 N.W.2d 10, 18 (1990)). The Court observed that hiring a contract killer is not consistent with being faced with imminent danger. The Court then concluded that "the confinement of self-defense instructions to cases of 'imminent danger' does not unreasonably apply Supreme Court precedent, and neither does the state courts' conclusion that a scheme to hire a contract killer does not involve such an imminent danger." *Id.* at 500.

The court further reasoned that because the Michigan courts were permitted to limit the petitioner's ability to raise a provocation defense, a theory of provocation was

not "material to the dispute" because "hiring a contract killer ... [was not an] 'act out of passion'" based on an event that would "cause a reasonable person to lose control," as required under Michigan law. *Ibid.* (quoting *People v. Sullivan,* 231 Mich.App. 510, 517, 586 N.W.2d 578, 582 (1998) (internal quotations omitted)). The Court noted, "Whether it is a question of self-defense or a question of provocation, Varner fails to explain why an individual who faces a nonimminent threat is not just as capable of calling the authorities as of hiring a contract killer." *Ibid.* "Allowing the state courts to define the scope of provocation in this way was not 'arbitrary or disproportionate,' did not 'infringe [ ] upon a weighty interest of the accused,' and did not violate a right that is 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Ibid.* (quoting *Scheffer,* 523 U.S. at 308, 118 S.Ct. 1261 (internal citations omitted) and *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)).

None of these factors come into play here. The petitioner's defense at trial was the well-established plea that someone else committed the murder. The State has no interest in limiting the proof of such a proposition, especially when the defense theory pointed to the State's main witness. The factors that rendered the balance of interests close in *Rockwell* and vitiated state policy reflected in the State's definition of self-defense in *Varner* are absent here.

The mistakes in the petitioner's initial briefing are serious. But the only material misstatement is the representation that Mark Peckham's oblique confession postdated Mr. Timmerman's murder. Exclusion of that evidence alone likely would not have a substantial and injurious effect on the jury's verdict. However, the removal of that potential evidence from the equation does not alter the Court's conclusion that the state court's failure to allow the other excluded evidence was contrary to and an unreasonable application of federal law as clearly established by the Supreme Court.

III.

Except as modified herein, the Court adheres to its earlier opinion conditionally granting the writ of habeas corpus.

Accordingly, it is **ORDERED** that the orders staying the judgment granting a conditional writ of habeas corpus [dkt. # 33, 34] are **VACATED**.